## COLORADO MILLING & ELEVATOR CO. v. RAPIDES GROCERY CO.

No. 4273.

Court of Appeal of Louisiana. Second Circuit.

June 15, 1932.

Hawthorn, Stafford & Pitts, of Alexandria, for appellant.

Polk & Robinson, of Alexandria, for appellee.

DREW, J.

This is a suit for breach of contract. Plaintiff is a flour manufacturer, and defendant, a broker in the city of Alexandria, La.

On October 16, 1929, plaintiff and defendant entered into a contract whereby defendant purchased from plaintiff a certain quantity of flour to be shipped within 120 days, shipping instructions to be furnished by defendant. The price fixed for "Snowbird" brand was $7.35 per barrel, and for "Rocky Mountain" brand, $6.75. It was optional with defendant as to which brand it desired.

Under the clause in the contract, entitled, "Rights of the Seller," we find the following:

" * * * If the buyer shall fail to furnish shipping instructions and/or packages as herein provided, the seller may (1) cancel the contract; or (2) terminate the contract, the buyer to pay to the seller as. liquidated damages on wheat flour remaining unshipped by reason of buyer's breach or default, the sum of:

"(a) One-third of one cent (⅓¢) per day per barrel on flour, and one cent (1¢) per day per ton on feeds, from the date of sale to the date of termination as the expense of carrying; plus

"(b) Twenty cents (20¢) per barrel as the cost of selling; and

"(c) Plus or minus the difference between the market value of a bushel of cash wheat at mill on the date of sale and on the date of termination, multiplied by 4.6 times the number of barrels of flour. This amount is to be added if the price of cash wheat is lower, and subtracted if the price of cash wheat is higher, upon the date of termination."

The contract further provides that, if the seller extends the contract 30 days, the buyer is to pay to the seller, as the expense of carrying, one-third of 1 cent per day per barrel. If, at the end of the extension of 30 days, the buyer is still in default as to shipping instructions, the seller may exercise options (1), (2), or (3).

Plaintiff received shipping instructions on 210 barrels of flour—Rocky Mountain brand —on February 7, 1930, and on February 24, 1930, shipped same to defendant. Defendant never gave shipping instructions on the remainder of the flour purchased. Plaintiff exercised its option under the contract, and extended the time for 30 days, until May 16, 1930, at which time it terminated the contract.

During the extension period, from March 16 to April 16, 1930, defendant gave shipping instructions on part of the remaining flour to be shipped on April 20, 1930, and, on April 14, 1930, before it was shipped, defendant countermanded the said order. After the termination of the contract by plaintiff on May 16, 1930, under its option in the contract, it filed this suit for damages in the sum of $420.50, as per amount of liquidated damages fixed by the contract, consisting of the following items: (1) One-third of 1 cent per day per barrel of flour from the date of contract to May 16, 1930, the date of termination of the contract; (2) 20 cents per barrel as cost for selling; (3) the difference between the market value of a bushel of cash wheat at the mill on the date of sale, and May 16, 1930, date of the termination of contract, multiplied by 4.6 times the number of barrels of flour.

The defendant denies the indebtedness and urges three defenses: (1) That no specific quantity of flour was bought or sold, it not being indicated whether the contract called for 500 barrels, tons, or hundredweight; (2) that plaintiff, through its general manager, agreed to give defendant the benefit of any decline in price; and (3) that the flour shipped to defendant by plaintiff was of an inferior quality, not up to grade; that defendant had to take back much of it from its trade, and hence was justified in its refusal to accept other flour from plaintiff.

The lower court rendered judgment for plaintiff, as prayed for, and defendant has appealed.

■ The first defense is leveled at the contract itself. The contract, in the column headed, "Quantity, Bbl., Ton or Cwt.," there are the figures "500" and nothing to designate whether it is 500 barrels, 500 tons, or 500 hundredweight. However, the testimony is conclusive that the contract calls for 500 barrels. The contract is the same form on which orders for feedstuffs are taken, and the evidence shows that flour is always sold by the barrel. The price also indicates that it was barrels of flour that were sold. All that part of the contract heretofore quoted deals with "barrel." It is also clear that defendant understood the contract to mean "barrel," as is shown by his order and shipping instructions of February 7, 1930, for 210 barrels of flour, and his later order and shipping instructions for 210 barrels of flour, which order was countermanded.

Defendant failed to offer any evidence to show that it bought 500 hundredweight of. flour or 500 tons of flour, although its manager, who purchased the flour, was the principal witness for defendant. Defendant does not contend that it bought flour by any other measurement than by the barrel. The contract in itself, upon reading it entirely, clearly shows that 500 barrels of flour were sold, and there is no merit to defendant's first defense.

When testimony was offered on the second defense, namely, that the general manager of plaintiff agreed to give defendant the benefit of any decline in price, it was objected to by plaintiff for the reason that it was an attempt to change the written contract by parol evidence of statements made prior to the signing of the contract. The objection was properly sustained and the evidence excluded. Defendant complains of this ruling and contends that the allegations of the answer set out fraud and error, and the testimony should have been admitted. The allegations of fraud and error relied upon by defendant, are contained in paragraph III of its answer, and read as follows:

"Answering the allegations of Par. IV of plaintiff's petition, it admits that it signed the written instrument which is annexed to plaintiff's petition, but denies that it constitutes a contract of sale for the reason that no specific quantity of flour was purchased or sold. In the alternative and in the event the court should hold said document to be a valid contract, which is not admitted, but which is specifically denied, and in the alternative only, this defendant denies that the written instrument which is annexed to plaintiff's petition, contains all of the promises and agreements, or in fact, the whole of the contract; it shows that while the said contract was signed on behalf of the plaintiff by L. W. Cotton, its agent, that as a matter of fact, the alleged sale was made and the contract was entered into after negotiations were had between the defendant and plaintiff, in which transaction the plaintiff was represented by its General Manager, G. B. Irwin, who was present in Alexandria, Louisiana, and whose representations and promises, both oral and written, were material to the subject matter, and, in fact, induced the defendant to sign the contract.

"Further answering the allegations of said paragraph, this defendant shows that prior to the time of the signing of this contract, it had bought other flour from the plaintiff company, some of which had been unsatisfactory, so defendant hesitated to have further dealings with the plaintiff company; that relying upon the promises, agreements and representations made by the said Irwin, said contract was executed by the said defendant; that these promises and agreements formed a part of the contract; that the said Irwin agreed that in the event the flour shipped out, or any part of it, proved to be unsatisfactory to its customers or trade, that it would accept the return of the flour found to be unsatisfactory, and would accept it back at the contract price, giving credit for any flour found to be defective; that, in addition, the plaintiff's manager agreed that in the event of a change in the flour market, such as a decline in price, that defendant company would be given the benefit of said decline, all of which it later refused to do.

"Defendant shows that since it was having these negotiations with the General Manager of the concern, and not with a mere agent, it did not insist that these representations, etc., be written into the contract; that it fully relied upon the said Irwin's authority, and his oral agreements, which it considered as a part of the contract itself; that to permit the plaintiff to now take advantage of the fact that these promises, representations and agreements were not written into the contract when they were, in fact, agreed to by its General Manager, would constitute fraud and error; that through fraud and error, and because of such fraud and error, said agreements were not made a part of the written contract, that this defendant now pleads such fraud and error."

It is clear that defendant failed to plead any act on the part of the general manager, representing plaintiff, which discloses fraud. The allegations are, in effect, that the written instrument does not embody the entire agreement of the parties as that agreement stood at the time the instrument was executed, but embodies only part of the agreement.

Article 2276 of the Revised Civil Code forbids parties to modify their contracts by parol testimony, after having drawn up a writing for the purpose of serving as complete evidence of their contract. Defendant does not allege a separate contract or a collateral contract, but alleges that the stipulations were part and parcel of the contract sued on. Article 2276 of the Code reads as follows: "Neither shall parol evidence be admitted against or beyond what is contained in the acts, nor on what may have been said before, or at the time of making them, or since."

The rule, as stated in Ruling Case Law, verbo, "Evidence," § 208, reads as follows: "Fewer of the rules of evidence are of wider application than that which declares extrinsic evidence not to be admissible, either to contradict, subtract from, add to or vary a written instrument. The execution of a contract in writing is deemed to supersede all the oral negotiations or stipulations concerning its terms and subject matter, which preceded or accompanied the execution of the instrument, in the absence of accident, fraud or mistake of fact; and no representation made prior to or contemporaneous with the execution of the written contract is held to be admissible to contradict, change or add to the terms plainly incorporated into and made part of the written contract."

The very allegations of defendant's answer show that it knew at the time of executing the contract, that it did not contain the stipulations it alleged were made to it by plaintiff's general manager.

This court has, on two occasions at least, passed directly on the question raised here. Both cases are styled alike. Brenard Mfg. Company v. Gibbs, and are reported in the 4 La. App. 312, and 9 La. App. 137. Judge Odom, the organ of the court in both cases, uses the identical language in both cases in disposing of this question, as follows:

"The defendant, in answer, sets up that the notes and the contracts were obtained by fraud and that they are therefore without consideration and are of no effect.

"But he failed to plead or testify to any act on the part of the agent representing the plaintiff which discloses fraud.

"An allegation of fraud by the pleader is but a conclusion reached by him. In setting forth the facts on which he based the allegation of fraud the defendant alleged, in answer, that the plaintiff's agent stated to him an experienced salesman would be sent in the territory to sell the talking machines, and that such salesman did not appear. He does not charge that the agent concealed or suppressed any material fact or that he made any misrepresentation with reference to the kind or quality of the goods in order to induce him to sign the notes and contract.

" 'As a general rule, in order to constitute actionable fraud, the false representation must relate to a matter of fact and such fact must be one which exists in the present or which has existed in the past.' 12 R. C. L. 244, Sec. 14. And —

" 'Since a fraud must relate to facts then existing or which have previously existed, the general rule is that fraud cannot be predicated upon statements promissory in their nature and relating to future actions nor upon the mere failure to perform a promise or an agreement to do something at a future time, or to make good subsequent conditions which have been assumed. Nor, it is held, is such nonperformance alone even evidence of fraud. Reasons given for this rule are that a mere promise to perform an act in the future is not, in the legal sense, a representation and a failure to perform it does not change its character. Moreover, a representation that something will be done in the future or a promise to do it from its nature, cannot be true or false at the time when it is made. A failure to make it good is merely a breach of contract which must be enforced by an action on the contract, if at all. And as in the case of promises, it is generally held that mere assertions on intentions or declarations of future purpose do not amount to fraud.' 12 R. C. L. 254, Sec. 21. See 20 Cyc., p. 20.

"In the case of Gage v. Lewis, 68 Ill. 604, it was held that a false representation as to a matter of intention, not amounting to a matter of fact, although it may have influenced the transaction, is not a fraud in law.

"And in Milwaukee Brick [& Cement] Co. v. Schoknecht, 108 Wis. 457, 84 N. W. 838, it was held that no statement as to what would be done in the future constitutes fraud.

"It therefore follows that if plaintiff's agent said everything that defendant says he did, he perpetrated no fraud upon defendant."

In the first circuit, the identical question was disposed of in the case of Brenard Manufacturing Company v. M. Levy, Inc., 2 La. App. 577. The Supreme Court passed upon the identical question in Hafner Mfg. Co. v. Lieber Lumber & Shingle Company, 127 La. 348, 53 So. 646, and in the very recent case of Trcka v. Bragmans Bluff Lumber Company, 174 La. 81, 141 So. 81.

The third and last defense raised by defendant is that the flour shipped to it under the contract was of inferior quality and not up to grade, thereby relieving it from giving shipping instructions for the remainder of the contract.

To establish this defense, defendant offered the testimony of its manager, a salesman, and three or four small merchants. The manager and the salesman testified they could not get repeat orders for the flour, due to its quality, and that defendant was forced to take back from the merchants several lots of flour sold, due to the merchants having to take it back from their customers. The merchants testified that, after selling a few sacks of the flour, their customers complained of the flour making dark biscuit, and that bread baked from this flour was off color.

It also offered a file of letters and telegrams that had passed between the manager of plaintiff and its salesman, Mr. Cotton, in which there was shown some complaint from other customers regarding flour bought from plaintiff.

This testimony, however, is of little value, due to the fact that not more than one of the other customers was complaining of the same brand of flour as that bought by defendant.

Defendant offered other evidence to show that, out of the 210 barrels of flour, it had let the Red Cross have 50 or 60 barrels, for two to three dollars per barrel, after it had sifted and resacked it.

The only complaint made against the flour is that, when made into biscuits, they were dark. It is not contended that it was unfit for human consumption. There is no testimony from any one who actually used the flour, nor is there anything to show the conditions under which it was used or the manner of baking.

In the case of Consolidated Flour Mills Co. v. Di Marco, 18 La. App. 292, 136 So. 657, 658, the first circuit court passed upon a like case. The evidence in that case, as in this, showed that the flour was intended for bread-making for family use, and the court said it must therefore be fit for human consumption, the

purpose for which it was bought by defendant and sold by the plaintiff, unless fitness for such purpose was waived: "The written contract contains no waiver of warranty in that respect; consequently, the sale was subject to implied warranty that the flour was fit for household use and for making bread for human consumption."

In the contract between plaintiff and defendant, there is no express warranty as to the color of the bread made from this flour. It is not warranted to make as white bread as flour of a higher grade and that cost more money. There is, however, an implied warranty that it is fit for human consumption. There is no testimony that it is not. The only testimony is that some small part of the flour was returned to the merchants with the complaint that biscuits made from it were off color. The very contract itself shows that the Rocky Mountain brand flour ordered by defendant was not the highest grade of flour. He had the option, under the contract, of ordering Snowbird brand flour, at $7.35 per barrel, or Rocky Mountain brand, at $6.75 per barrel. He chose to order the lower grade and necessarily could not expect the same results as from a higher grade.

Defendant knew what it was ordering, as its manager testified that he had ordered the same brand twice before and had had the same trouble about it being off color. Defendant has never attempted to have plaintiff take back any part of the flour shipped. It has never asked for a rebate or refund on account of the alleged defect, nor has it reconvened in this case asking damages for any loss on account of said defective flour.

Plaintiff proved that the flour shipped to defendant was not manufactured until after receiving the order on February 7, 1930, and, as soon as it was manufactured, it was shipped to defendant; that it never manufactured flour for family use until after receiving the order, for the reason that family flour deteriorates with age; that when manufacturing flour, an actual test is made at stated intervals during the day, by baking it into bread, and that these tests were made of this flour, and it was found to be up to grade for flour of that brand.

It is indeed strange that this 210 barrels of flour was made at one and the same time, and some of it should be bad and the greater part of it, not. We think the defendant has failed to show that the flour was below the grade purchased, and that it is not fit for human consumption, a warranty implied from the contract. However, a reading of the testimony of the manager of defendant company will convince any reasonable man that the grade of flour was not the reason defendant failed to comply with the contract, and that the real reason was that, from the date of signing the contract until the date of violating it by

defendant, there had been a sharp decline in the price of wheat and of manufactured flour. This is clearly shown by the testimony of defendant's manager. Very soon after the signing of the contract, the price of flour declined, and, although plaintiff was constantly urging defendant to give shipping instructions, it was not successful in getting the first order until after the term of the contract was extended 30 days.

Defendant's manager, on direct examination, testified in part as follows:

"Q. What caused you to fail to give shipping instructions on the balance of the flour? A. Well, because Mr. Irwin failed to fulfil part of the agreement we had in purchasing the flour. Just because he refused to reduce the flour to the contract price.

"Q. You mean to market price? A. Yes, sir.

"Q. Was that the first trouble that you had with them? A. Well, we had trouble before, with the quality of the flour. When the first car was shipped out it was supposed to have been shipped at the reduced prices. They were supposed to send us a check for the difference, which they never did do.

"Q. Did you then begin to have trouble with the flour? A. Well, right away. Twelve days after the flour came we had trouble with it.

"Q. Did that cause you to refuse to order out any other flour? A. Yes, sir, it did."

The record shows the first car of flour was shipped on February 24, 1930, and defendant's manager swears that 12 days later they had trouble with the flour. Yet, at a date after he claimed trouble had shown up, he gave instructions for another car of 210 barrels to be shipped, which order he countermanded. When cross-examined about this, he testified as follows:

"Q. As a matter of fact, didn't you give Mr. Cotton or possibly Mr. Mason shipping instructions later on another car of flour? A. With the understanding that we would reduce the price of the flour to the market of that day. * * *

"Q. Now, at the time you gave those shipping instructions it was with the understanding that the car should be shipped out in the next thirty days? A. With the understanding the price was to be reduced to the price of flour that day.

"Q. Sort of compromise basis, that right? A. No, sir. We had the distinct understanding when we bought the flour that they were to reduce the price of the flour.

"Q. Did they refuse to deliver you this second car at the reduced price? A. Yes sir. * * *

"Q. And then, between that time (time he gave last shipping instructions) and your wire of April 14th, nothing more was said about the shipping instructions? A. Yes, sir. Mr. Cotton was here several times.

"Q. I mean, with reference to countermanding the shipping instructions? A. Well, he came back several times to let them ship the flour and I never would agree, unless they agreed to reduce the price to the market as per the agreement we had—I had with Mr. Irwin when I bought the flour."

When the witness was then taken by his own attorney, he testified as follows: "Q. Mr. Stafford, I will ask you about the time you wired to the company to cancel the shipping instructions on the second car, if that wasn't about the time you were getting all these complaints and flour was being returned to you? A. Yes, sir. That is what the records show, approximately the same date."

We have quoted extensively from the witness' testimony—something we do not usually do—and have attempted to quote all of his testimony wherein he gave his reason for not giving shipping instructions on the remainder of the flour bought. It is to be noted that he never gave as a reason for not giving shipping instructions, that the flour was below grade, except in answer to leading questions by his attorney, and his last answer does not conform to his previous testimony of having trouble with the flour 12 days after receiving it, on or about March 1st.

In all other parts of his testimony, without being led, he unequivocally gave as his reason for not giving shipping instructions, that plaintiff would not allow a reduction in price to which he thought he was entitled.

██ We are convinced that it was not the grade of flour that caused defendant to violate its contract, but was because plaintiff would not reduce the price fixed in the contract. This did not justify defendant in not giving shipping instructions, and it is liable for the liquidated damages as fixed by the contract.

The amount of damages is correctly computed by the lower court, and the judgment is correct. It is therefore affirmed, with costs.

PALMER, J., dissents.