## HANOVER MODULAR HOMES OF NORTH LOUISIANA, INC., et al.,

v.

## SCOTTISH INNS OF AMERICA, INC., et al.,

**Central Savings Bank and Trust Company, Intervenor.**

Civ. A. No. 74–176.

United States District Court,
W. D. Louisiana,
Monroe Division.

Jan. 26, 1978.
Addendum Jan. 27, 1978.

Thompson L. Clarke, Saint Joseph, La., T. A. Grant, III, Nauman S. Scott, III, Grant & Scott, Monroe, La., for plaintiffs.

William D. Brown, Brown & Wicker, Monroe, La., for defendants Scottish Inns.

Edward Michael Ellis, Child, O'Connor, Ellis & Petty, Knoxville, Tenn., for C. E. Scott.

Snellings, Breard, Sartor, Shatto & Inabnett, Monroe, La., for intervenor.

DAWKINS, Senior Judge.

## OPINION

Plaintiffs bring this action against C. E. Scott to recover damages for alleged false representations in the course of contractual relations between agents of Hanover Modular Homes of North Louisiana, Inc., (Hanover), and Scottish Inns of America, Inc., (Scottish Inns). Suit against Scottish Inns,

brought in the Sixth Judicial District Court of this State on January 25, 1974, was removed to this Court on February 13, 1974. Thereafter, C. E. Scott, Scottish Inns' former president and chief executive officer, was impleaded as a defendant on April 28, 1975. Central Savings Bank and Trust Company, of Monroe, (Central Bank), has intervened as plaintiffs' creditor to assert its claim to any possible recovery.

Pursuant to a petition for reorganization, under Chapter XI of the Bankruptcy Act, the Bankruptcy Judge for the Eastern District of Tennessee, Northern Division, on November 22, 1976, ordered a stay as to commencement or continuation of any proceedings against Scottish Inns. Therefore, the action against Scott individually was severed from the remaining demands. Following a bench trial, held on February 28 and March 1, 1977, we took the matter under advisement upon briefs to be filed. All parties' briefs now having been received, we proceed to a decision on the merits.

## FINDINGS OF FACT

1. Hanover Modular Homes of North Louisiana, Inc., is a Louisiana corporation formerly engaged in manufacturing concrete modular units used in construction of private dwellings and other buildings. These activities were carried out at Hanover's plant at St. Joseph.

2. Plaintiffs Houston Morris, William G. Edwards, B. L. Moss III, Lantz Womack, Fred Herlevic, Ralph Gill, and Thompson Clarke, all Louisiana domiciliaries, were the stockholders and members of Hanover's Board of Directors.

3. C. E. Scott is a resident and domiciliary of Tennessee.

4. In late 1972, Hanover's officers became interested in the motel construction process employed by Scottish Inns. Ralph Gill contacted C. E. Scott, president of Scottish Inns, with a view toward contracting to supply modular units for Scottish Inns motels. Shortly afterward, Scott flew to Natchez, Mississippi, en route to Hanover's plant at St. Joseph. During this visit, Scott and Gill reached tentative agreement on the terms of a contract whereby Scottish Inns would order, within 90 days, 500 modular units for motels at a cost of $250 per unit. Under this arrangement, it would be Hanover's responsibility to pay all expenses other than charges for labor and materials. Before the contract actually was signed in late February, Scottish Inns promised to order 1,000 units instead of the 500 first mentioned.

5. In February of 1973, Hanover's financial situation was weak. To reduce the corporation's large indebtedness, and in anticipation of the Scottish Inns contract, Central Bank loaned the corporation $275,000 on February 12, 1973, secured by personal guarantees of the individual plaintiffs. They would not have guaranteed the note to Central Bank were it not for Scott's promise, on behalf of Scottish Inns to order 1,000 units within 90 days.

6. A contract in accordance with the terms of the earlier tentative agreement was signed at Jackson, Mississippi, on February 27, 1973.

7. Approximately one month later, Scottish Inns' personnel moved into the Hanover plant and modified the interior to make it suitable for construction of its motel units.

8. Initially, one hundred units were ordered. The method of producing Scottish Inns units differed from that previously used by Hanover to construct other modular units in that some of the work on the motel units was performed outside. When high water began to invade portions of the plant site in April of 1973, efficient production somewhat was impaired. The first one hundred units were completed in May. The plant then was closed briefly by Scottish Inns' personnel, purportedly because of high water. Scott personally visited Hanover's plant in late May or early June and shortly thereafter a second one hundred units were ordered and production recommenced. Within 90 days following execution of the contract, Scottish Inns had placed orders for no more than 200 units.

9. A third one·hundred units were ordered in approximately September of 1973. Before these units were completed fully, they were moved by Scottish Inns' personnel to a plant at Brownwood, Texas.

10. Because of concern over Hanover's indebtedness to Central Bank, it was agreed in July of 1973 that all payments by Scottish Inns for completed units would be made jointly to Hanover and Central Bank. As the situation continued to deteriorate, Bank officials arranged a meeting with members of Hanover's Board of Directors and Scott to ascertain the viability of Hanover's contract with Scottish Inns. At this meeting, which took place in September of 1973, at the Bank in Monroe, Louisiana, Scott assured those present that Scottish Inns was committed to fulfilling its contract with Hanover and that he would do everything he could to see that it did.

11. Sometime in November or December of 1973, Hanover's plant finally was closed. Scottish Inns did not place any orders for motel units with Hanover after the third group of one hundred units was ordered in September of 1973.

12. When Scott was negotiating the contract with Hanover, he had no real intention of honoring the obligation he was imposing upon Scottish Inns to order, within 90 days, 1,000 modular units. Scott testified he thought the contractual agreement meant that orders would be placed with Hanover as they were received by Scottish Inns. This view is totally unsupported, and, in fact, contradicted by the express language of the contract. In this and other respects, Scott's credibility as a witness was *nil*.

■ While fraudulent intent not to perform cannot be inferred from the mere fact of non-performance, the lack of any serious attempt to comply with firm contractual obligations is clearly indicative of the promisor's state of mind. Scott's deliberate disregard of the contract's terms, on many occasions after its execution, bespeaks nothing less than a clear intent on his part from the beginning to breach it in any manner he unilaterally saw fit to follow. Based upon Scott's credibility as a witness and all surrounding circumstances, we find that his promise that Scottish Inns would order 1,000 units within 90 days was deliberately false when made.

## CONCLUSIONS OF LAW

We have jurisdiction over the parties and subject matter of this action and venue is proper. 28 U.S.C.A. § 1332; 28 U.S.C.A. § 1391.

■ Louisiana law governs the substantive issues before us. While not all incidents of alleged false representation took place in Louisiana, no other State has substantial contacts or interest in the parties or subject matter in this litigation. *Jagers v. Royal Indemnity*, 276 So.2d 309 (La.S.Ct. 1973); *Commercial Union Insurance Company v. Upjohn Company*, 409 F.Supp. 453 (W.D.La.1976); *Ardoyno v. Kyzar*, 426 F.Supp. 78 (E.D.La.1976). The injury to the individual plaintiffs took place in Louisiana; all are residents of Louisiana; all of Scott's false representations dealt with his purported intent to perform a contract in Louisiana; and this State is where the relationship between the parties is centered.

The plaintiffs contend that Scott purposely employed a scheme of deceit to obtain use of their St. Joseph plant. Specifically, they allege that Scott promised to order from Hanover 1,000 motel modular units within 90 days, as later set forth in the written contract of February 27, 1973, knowing that he, as president of Scottish Inns, did not intend to comply with the promise.

■ In general, to constitute actionable fraud, a false representation must relate to a matter of fact, and such fact must be one which presently exists or which has existed in the past. Since fraud must relate to facts then existing or which have previously existed, the general rule is that fraud cannot be predicated upon statements merely promissory in their nature and relating to future actions, nor upon mere failure to perform a promise or an agreement to do something in the future. A representation

that something will be done in the future, or a promise to do it, from its nature cannot be true or false at the time when it is made. Failure to make good on a promise is thus merely a breach of contract which must be enforced by an action on the contract. *Colorado Milling and Elevator Company v. Rapides Grocery Company*, 142 So. 626 (La. App. 2d Cir. 1932).

■ But fraud may be predicated on promises made *with intent not to perform*. Then, the misrepresentation is of a present rather than future fact. *Polusky v. Allstate Petroleum, Inc.*, 180 So.2d 815 (La. App. 4th Cir. 1965); see also, *Johnson v. Mansfield Hardwood Lumber Company*, 159 F.Supp. 104 (W.D.La.1958), aff'd 263 F.2d 748 (5th Cir. 1959), cert. den. 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 120 (1959). In *Polusky*, the Court quoted from 23 Am.Jur. 798, as follows:

> " 'Where a promisor has no intention of performing his promise when it is made, in the view taken by a majority of courts, a fraud has been committed by deliberate deception and false pretense. Such cases rest upon an entirely different basis for the predication of fraud from that which would be possible in cases of promises honestly made, but subsequently unfulfilled.' " 180 So.2d 815, at 817.

■ Plaintiffs complain that Scott's promises on behalf of Scottish Inns to order 500 units, later expanded to 1,000 units, were made with intent not to perform. We have found as a fact that, when the contract was executed by Scott for Scottish Inns, he did not intend to perform the contractual obligations imposed upon his company. Scott's promise for Scottish Inns to order *1,000 units within 90 days* was nothing less than a sharp practice employed by Scott as merely an inducement to plaintiffs to enter into a contract. Because of its weak financial posture, Hanover could not afford to become involved in a long-term project without immediate, regular income—a substantial cash flow, which the contract, if honored, would have provided. Once Scottish Inns' personnel took control of the St. Joseph plant, they delayed production repeatedly, not only without regard to its contractual obligations to Hanover, but in furtherance only of its own interests. The facts clearly show not merely a breach of contract but foreconscious deception by Scott which amounted to fraud. Such callousness is inexcusable and renders him personally liable to these plaintiffs, many of whom have been virtually bankrupted by his false promises and total disregard of the contract's clear, unambiguous terms.

It is virtually impossible to restore the plaintiffs to the position they would have occupied absent Scott's false representations. Doing business with Scott and Scottish Inns proved to be too much for Hanover; the corporation now is insolvent. Hanover's plant facility at St. Joseph is in very poor condition and will require substantial repairs before it again could be operational. But the nature of these losses is speculative.

■ The best measure of damages is the amount of indebtedness personally guaranteed to Central Bank by the individual plaintiffs on or about February 12, 1973. We have found that these individuals would not have made themselves liable for $275,-000 of corporate debt but for Scott's false representations. In view of Hanover's insolvency, it has fallen upon the individual guarantors to undertake repayment. While the February 12 loan to Hanover was used primarily to reduce corporate indebtedness incurred before any dealings with Scott, its stockholders' personal liability arose as a direct result of Scott's fraud.

For these reasons, judgment will be entered in favor of the individual plaintiffs and against C. E. Scott in the amount of $275,000, with interest at the rate of 7% *per annum* from judicial demand until paid.

### ADDENDUM

Since our ruling and judgment of yesterday, we have received today a statement from Central Bank which shows the amounts the individual stockholders have paid upon principal and interest since May 17, 1974. The payments total $105,380.24.

Notwithstanding these payments, the balance due remains $261,705.99.