## Henry *v.* Pearson

No. 42758 December 16, 1963 158 So. 2d 695

I

*Jack H. Young, Carsie A. Hall,* Jackson; *Robert L. Carter, Barbara A. Morris, Marie L. Marcus,* New York, N. Y., for appellant.

64

*Semmes Luckett, Leon Porter, C. L. Sullivan,* Clarks-
dale, for appellee.

KYLE, J.

This case is before us on appeal by Aaron E. Henry, defendant in the court below, from a judgment of the Circuit Court of Coahoma County rendered in favor of Thomas H. Pearson, plaintiff, in an action for damages for libel. The case is a companion case to the case of Henry v. Collins, No. 42,759, which was decided by this Court on December 2, 1963, 253 Miss. 34, 158 So. 2d 695.

The plaintiff's action for libel was based on a letter written by the defendant to W. C. Norwood, the deputy sheriff of Bolivar County, containing references to the plaintiff, who was county attorney of Coahoma County, and a statement communicated by the defendant to Lloyd B. Jeffers, a news reporter in the employ of United Press International news agency, under circumstances said to insure its being printed in those newspapers in Mississippi which subscribed to its service, and a statement communicated by the defendant to Van H. Savell, a news reporter in the employ of the Associated Press, under circumstances said to insure its being published in those newspapers in Mississippi which were members of the Associated Press.

The letter written by the defendant to W. C. Norwood, deputy sheriff of Bolivar County, was dated March 6, 1963. In his letter the writer thanked the deputy sheriff for the fair manner in which he was treated while he was in custody as a prisoner on Saturday night, March 3, 1962. The writer then stated in his letter to Norwood the following:

"You will probably see in print where I have filed a complaint with the Justice Department charging a denial of Civil Rights in the arrest itself. The complaint states that in my opinion the charge under which I was arrested was born in the minds of the County Attorney and the Chief of Police of my town due to my activity in the area of desegregation, registering and voting and politics as I serve on the committee of the

Trammel to Congress Committee, sponsoring a Negro for Congress. Also these two men are against me due to my activity in suggesting to Negroes that we all trade in those stores that employ us and hire us above the menial level.

"What I want to be clearly understood that I am not charging nor am I of the opinion that you nor any other authority of Bolivar County is a party to this diabolical plot. I do think that the two men above mentioned has schemed with some person to make the charge in Bolivar County and unknowingly Bolivar County is being used to some extent as a party in the Racial difficulties of Coahoma County * * *.''

The statement which was communicated by the defendant to Lloyd B. Jeffers, a news reporter in the employ of U. P. I. and which was sent by U. P. I. to the Clarksdale Press-Register, The Daily Corinthian, The Delta Democrat-Times, and The Meridian Star, and published by each of those newspapers in its edition of Wednesday, March 7, 1962, is as follows:

"Clarksdale, Miss. (UPI) — Aaron Henry, state president of the National Association for the Advancement of Colored People said Tuesday night he had asked the FBI to investigate his arrest on Saturday on a morals charge.

"Henry issued a statement saying he had filed a formal complaint with the Justice Department charging his civil rights had been violated by officers from nearby Bolivar County and Clarksdale.

"He was arrested Saturday night by Police Chief Ben Collins on a Bolivar County warrant charging him with disturbing the peace by allegedly making immoral advances to an 18-year-old white youth.
"* * *

"Henry called the arrest 'a diabolical plot cooked up' by the Coahoma County prosecutor, Thomas H. Pearson, and Collins * * *.''

The statement which was communicated by the defendant Henry to Van H. Savell, news reporter in the employ of the Associated Press, and incorporated in a news item which was sent by the A. P. to the Vicksburg Evening Post and The Biloxi-Gulfport Daily Herald, and published in each of those newspapers on March 7, 1962, was substantially the same as that given to the representative of the U.P.I.

The plaintiff filed his declaration on April 25, 1962, and in his declaration charged that the statements made by the defendant in his letter to W. C. Norwood, deputy sheriff of Bolivar County, dated March 6, 1962, and the statements communicated to the news reporters of United Press International and the Associated Press in the City of Jackson concerning the plaintiff were false, defamatory and libelous, and the publications thereof by the defendant were unprivileged, and directly, without qualification, accused the plaintiff of misconduct and malfeasance in office as the county prosecuting attorney of Coahoma County, and unequivocally attributed unto the plaintiff as an attorney at law a gross violation of the Code of Ethics of the legal profession; and that the natural and proximate consequences of said publications had caused and would necessarily thereafter cause injury to the plaintiff in his personal social, official, business and professional life, thereby exposing him to public hatred, contempt and ridicule, and causing irreparable damage and injury to his reputation and good standing in the community. The plaintiff therefore demanded judgment for damages in the amount of $25,-000. Copies of the letter addressed to Mr. Norwood, deputy sheriff of Bolivar County, and the above mentioned news releases of the U.P.I. and A.P. dated March 6, 1962, and published in the above mentioned newspapers, were attached as exhibits to the plaintiff's declaration.

The defendant in his answer admitted that he wrote the letter which was addressed to W. C. Norwood, deputy

sheriff of Bolivar County, but denied that the letter was maliciously prepared and further denied that it was defamatory and libelous. The defendant also denied that he had maliciously prepared and published of and concerning the plaintiff false statements by deliberately communicating the same to the officers of the U.P.I. and the A.P. in Jackson, as alleged in the plaintiff's declaration. The defendant denied that he had communicated to the U.P.I. and A.P. false defamatory and libelous statements; and the defendant denied that he had caused to be published any unprivileged publications, which accused the plaintiff of misconduct and malfeasance in office, or which attributed to the plaintiff, as an attorney at law, a gross violation of the Code of Ethics of the legal profession; and the defendant further denied that, as a natural and proximate consequence of any statements published by him, injury had been caused or would thereafter be caused to the plaintiff in his personal, social, official business and professional life.

The case was tried before a jury at the July 1962 term of the court; and the jury returned a verdict in favor of the plaintiff for the sum of $25,000. The court overruled the defendant's motion for a new trial, and a judgment was entered in favor of the plaintiff against the defendant for the amount stated in the verdict of the jury. From that judgment the defendant has prosecuted this appeal.

The appellant has assigned and argued four points as grounds for reversal of the judgment of the lower court: (1) That the court erred in overruling the defendant's challenge of the juror, L. R. Allen, for cause; (2) that the court erred in overruling the defendant's motion for a directed verdict at the close of the plaintiff's case; (3) that the court erred in overruling the defendant's motion to amend the answer so as to allege the defense of qualified privilege by reason of ''fair

comment;" and (4) that the court erred in denying defendant's motion for a new trial.

In view of the nature of the questions presented for our decision on this appeal, it is necessary that we give a brief summary of the evidence upon which the jury based its verdict. We shall not undertake to review in detail the testimony of each of the witnesses who testified concerning the events which led up to the appellant's arrest by the Chief of Police of the City of Clarksdale on a warrant issued by the Bolivar County justice of the peace, or the testimony of the news reporters of the U.P.I. and the A.P., who testified concerning the telephone calls which the appellant made to them on March 6, and the statements read by the appellant to them concerning his arrest on the disorderly conduct charge which he characterized as a "diabolical plot cooked up by the county prosecutor, Thomas H. Pearson, and Collins." The evidence relating to the appellant's arrest by the Chief of Police of the City of Clarksdale on the warrant issued by the Bolivar County authorities on March 3, 1962, and the evidence relating to the telephone conversations which the appellant had with the representatives of the news agencies on March 6, 1962, which resulted in the publication of the appellant's statements in the Clarksdale Press Register, the Biloxi-Gulfport Daily Herald, The Daily Corinthian, The Delta Democrat Times, and the Vicksburg Evening Post, has been clearly summarized in the opinion of Judge Lee in the Collins case; and a restatement of the evidence on those points need not be made by us in this opinion.

Other parts of the testimony which are directly applicable to the issues presented for our consideration on this appeal may be summarized as follows:

The appellant Aaron E. Henry, who was called to testify as an adverse witness by the plaintiff, admitted that he had written the letter referred to in the pleadings, addressed to W. C. Norwood, deputy sheriff of

Bolivar County, and dated March 6, 1962, and had mailed the letter to Norwood at Cleveland, Miss. The appellant also stated that, on March 6, 1962, he returned telephone calls and gave statements concerning his arrest to representatives of the U.P.I. and A.P. news agencies at Jackson, Mississippi; that one of the news agencies had called him on the telephone about a report that he had made a statement to the Federal Bureau of Investigation concerning his arrest; and after finding out there was nothing further the Justice Department wanted concerning the report, he discussed the report which he had made to the F.B.I. with the representatives of the news agencies. The appellant was asked to read the statement published by the U.P.I. under date of March 6, 1962, and was then asked to state whether he gave that statement to the representative of the U.P.I. His answer was, "The statement as written — some of it, was taken out of context, but not all of it." He admitted that he told the representative of the U.P.I. that he had been arrested on the morals charge and there was no basis for it, and "that I thought it was a scheme to degrade me, and the words 'diabolical plot' were developed as he and I discussed it." He stated that he did not recall whether he said "diabolical plot" or just how it came about, but the words "diabolical plot" were not included in the statement that he filed with the F.B.I.

The appellant was then asked the following questions and gave the following answers: "Q * * * Didn't you tell the representative of the U.P.I., who happened to be Mr. Lloyd Jeffers, in that conversation that I referred to, that 'your arrest was a diabolical plot cooked up by the Coahoma County Prosecutor, Thomas H. Pearson, and Chief of Police Ben Collins? A. I am saying that I don't know whether I talked to Mr. Jeffers at all, or no. Q. Well, whoever you talked to, did you make that statement to them? A. No. The 'diabolical plot' phrase grew out of as much his suggestion as it

was mine. Q. Well, did you have any part in the description of it as 'a diabolical plot?' 'Cooked up by Mr. Pearson and Mr. Collins?' A. I don't recall the phrase 'cooked up' at all, but I do recall that as we discussed this thing, that the word 'diabolical' was used, but I don't recall whether the word 'plot' was used or not. Q. Were they used by you? A. They were used in the discussion of it with him."

Similar answers were given to questions propounded by the plaintiff's attorney concerning the statement published by the Associated Press. The appellant admitted that he had used the words "diabolical plot" in his letter to Mr. Norwood dated March 6, 1962. He stated that he was talking about the chief of police and county prosecuting attorney, whoever they happened to be.

Manuel Nassar, Deputy Sheriff of Bolivar County, and deputy marshal for the Town of Shelby, testified concerning the complaint made by Sterling Lee Eilert before a justice of the peace in the Town of Shelby around 5:00 P.M. on March 3, 1962, and the issuance of the warrant for the arrest of Aaron E. Henry on a disorderly conduct charge.

Ben C. Collins, chief of the police department of the City of Clarksdale, testified that he first became aware of the fact that a warrant had been issued for the arrest of Henry when he heard the Shelby Police Department call the Clarksdale Police Department and inform the Clarksdale Police Department that a warrant had been issued by the Bolivar County Justice of the peace for the arrest of Henry. He got the news over the radar machine, and he called officer Henry Petty and directed him to be on the lookout for Henry, and if he saw Henry's car to keep him under surveillance until a warrant could be sent to Clarksdale. He also instructed the desk sergeant to call Shelby and advise them to send the warrant to Clarksdale and the Clarksdale Police Department would try to locate the appellant. Collins stated

that at that time he did not know the nature of the charge which had been made against Henry; but soon thereafter the warrant for Henry's arrest was received, and Collins instructed the desk sergeant to call Officer Petty and have him stand by until he could bring the warrant over and make the arrest. Collins stated that up to that time he had not discussed the warrant with Mr. Pearson, the county attorney, and so far as he knew, the county attorney knew nothing about his activities in the matter, Collins took the warrant and made the arrest at the appellant's home. The appellant asked what the charge was, and Collins told him that the warrant stated that the charge was ''disorderly conduct.'' The appellant then read the warrant. Collins stated that, on the way back to the jail, before he locked the appellant up, he called the police department and directed that the Bolivar County authorities be notified immediately that the appellant was in custody and to send officers for him.

Collins stated that, when he arrived at the police headquarters, the desk sergeant told him that the mayor wanted to talk to him on the telephone. Collins called the mayor, and the mayor came down to the city hall. Collins told the mayor about the warrant which had been issued by the Bolivar County justice of the peace, and the appellant's arrest. Collins did not know whether the offense, if any, had been committed across the county line in Bolivar County or in Coahoma County. The mayor advised Collins to call the county attorney, and ask him to come to the city jail. The county attorney was called on the telephone and came to the city jail. Collins was asked whether Mr. Pearson at any time prior to the arrest ever discussed the matter with him, ''or did you engage in a plot with him.'' His answer was, ''None whatever.'' He stated that neither he nor Pearson knew anything about the matter until after the affidavit had been made against the appellant in

Bolivar County and a warrant had been issued for the appellant's arrest. Collins stated that the reason he made the arrest personally was because the appellant had been arrested before, and every time he was arrested he always hollered "persecution", and Collins wanted to make the arrest himself to make sure that there was no such thing as persecution involved in the case.

W. Kincade, Mayor of the City of Clarksdale, testified that he received information about the arrest of Henry sometime before dark; that he went to the city jail and interrogated the white boy, Sterling Lee Eilert, and he then decided that it was necessary to call the county attorney, for the reason that the charge against Aaron was not a charge of the city. He therefore directed the chief of police to call the county attorney. So far as the mayor knew, Pearson had no knowledge of Henry's arrest until he was called on the telephone by the chief of police. The mayor stated that he talked to Mr. Pearson himself when the telephone call was made, and he told Mr. Pearson that he thought he should come down to the police station; that Pearson was reluctant to come to the police station for the reason that he had another appointment for the evening, but he came, as requested by the mayor, and questioned the boy Eilert and also the defendant Henry; and that he had a tape recorder which he used during the time he was questioning each of the parties.

The plaintiff Pearson, testifying in his own behalf, testified that Collins called him on the telephone at his home about 7:45 P.M. and told him that Aaron Henry had been arrested on a disorderly conduct charge, and Collins asked him to come to the city jail. Pearson stated that he knew nothing about the arrest of Henry until he received the call from the chief of police; that he and his wife had planned to go with another couple to a dance; but he went to the police station immediately. Kincade and Eilert were there when he arrived. He

talked to Eilert, and he interrogated the defendant. Pearson stated that he had never seen Eilert before, and he knew nothing about him; and after talking to him he decided to get his tape recorder and take down all of the statements on the tape recorder. After taking statements from the parties, it appeared to him that no criminal offense had occurred in Coahoma County; and he therefore left the police station. He had never discussed with Collins or the boy Eilert a plot against Aaron Henry.

On cross-examination by the defendant's attorney, Pearson was asked, whether he ever, at any time, had occasion to question the defendant about his activities with the NAACP. In answer to that question Pearson stated that several months before the trial Henry and several other persons had been arrested and charged with conspiring to withhold trade from down-town merchants in Clarksdale; that prior to the arrest of the defendants on that charge he had talked to Henry and the others about the boycott and the law which made it a criminal offense for persons to conspire to commit acts injurious to public trade; that he told them that in his opinion the boycott was definitely injurious to public trade, and he felt that the boycott should cease, so that the city could have a normal Christmas trading season. Henry failed to heed his advice and admonition, and he made an affidavit against Henry for a violation of the law.

Stanny Sanders, an attorney of Greenwood, Mississippi, who had served as district attorney for the Fourth Judicial District for a period of 11 years and as Complainant Commissioner of the Mississippi State Bar, testified that in his opinion the charge that a county attorney and policeman had ''concocted a diabolical plot'' to bring about the arrest of a citizen on a morals charge would impute a crime to the county attorney, and even

if unproved would injure his reputation and lower him in the public's esteem and confidence.

At the conclusion of the plaintiff's evidence the defendant was recalled to testify as a witness in his own behalf, and on direct examination by his attorney, the defendant was asked whether he had had any personal contacts with Mr. Pearson prior to March 3, 1962. In answer to that question, the defendant stated that, going back about three years, when Mr. Pearson was a candidate for county attorney, Mr. Pearson called on him to solicit his help in getting elected, and during the conversation which he had with Mr. Pearson at that time "it developed that Mr. Pearson and I were pretty wide apart about the rights of Negroes, and we couldn't come to any understanding as to whether we would support him or not." The defendant also stated that, at another time, when three young people were arrested for having decided that they could use any part of the local train station they desired, Mr. Pearson called him to his office to talk to him about that; and Mr. Pearson stated to him that the children would not have gone down there if they had not been encouraged by him and other adults. The defendant also recalled that on December 6, 1961, Mr. Pearson had Mr. Collins arrest him for an alleged violation of the anti-boycott statute. The defendant was later asked the following question, and gave the following answer: "Q. Now, based on the contact which you said you had with the plaintiff, Mr. Pearson, has it been your feeling that you were or were not being harassed by Mr. Pearson? A. I would say I have been harassed by him." The defendant stated that, when he wrote the letter to Mr. Norwood and made the statements to the newspaper reporters referred to above, he felt that some answer to the charge which had been made against him was necessary; that he was not mad at Mr. Pearson at the time he wrote the letter to Mr. Norwood and made the statements to the news

agencies, and he was not mad at him at the time of the trial; but, since the crime was alleged to have been committed in Bolivar County, he felt that Mr. Pearson acted improperly in interrogating him in Coahoma County.

Four witnesses were called to testify on behalf of the defendant on the question whether the plaintiff had suffered actual damage to his reputation as a result of the publication of the libelous charge against him. H. Y. Hackett, an insurance agent of Clarksdale and M. J. McMillian, who operated a laundry in the City of Clarksdale, testified that they had read the newspaper article relating to the statement made by Henry concerning Mr. Pearson, and the article had not affected their opinions of Mr. Pearson. Reverend J. D. Rayford, who had lived in Clarksdale about 20 years, testified that he had read the article which appeared in the Clarksdale Register, and he did not think the article would cause any of Mr. Pearson's clients to refrain from employing him as an attorney. Dr. Luther McCaskill, a physician who lived in Clarksdale, also testified that he had read the article published in the Clarksdale newspaper, and it had not changed his opinion of Mr. Pearson; that it was his opinion that any statement Henry might have made about Mr. Pearson would have enhanced Mr. Pearson's reputation, because he was for integration and Mr. Pearson, like most people in the county, was a pro-segregationist.

We think there is no merit in the appellant's contention that the court erred in overruling the defendant's challenge of the juror L. R. Allen for cause.

 █ The record shows that Allen on his voir dire examination stated that he was married, but had no children; that he was a member of the Christian Church; that he knew counsel for the plaintiff; and that Mr. L. L. Porter, Jr., was handling a case for his company at the time of the trial. The defendant's attorney chal-

lenged the juror for cause. Allen was then asked whether he could try the case fairly and impartially upon the law and evidence and that alone, and a just verdict return. His answer was that he could. He then stated that he had no malice or ill will against the defendant, and that he had no desire to reach any verdict except that verdict to which the evidence directed his mind. The court overruled the defendant's challenge of the juror for cause. The record shows that the court did not restrict defense counsel in any way in his examination of the other jurors. Each side exercised four peremptory challenges; and the juror Allen was not one of the jurors who tried the case. The company that Allen worked for was not a party to the suit; and in our opinion Allen was not disqualified to serve as a juror merely because one of the plaintiff's attorneys was representing his company in some other litigation at the time of the trial.

▇▇▇ We also think there was no error in the action of the trial judge in overruling the defendant's motion for a directed verdict at the close of the plaintiff's case, or in the action of the trial judge in overruling the defendant's motion, at the conclusion of all of the evidence, for leave to amend his answer to the plaintiff's declaration so as to allege, as an additional defense, qualified privilege based on fair comment.

Similar errors were assigned and argued without avail as grounds for reversal of the judgment of the lower court in the Collins case, and what was said in the Collins case on the two points mentioned is applicable to the facts in this case.

In answer to the appellant's contention that he was entitled to a directed verdict in the Collins case, Judge Lee, after commenting upon the appellant's charge that his arrest was the result of a ''diabolical plot'' cooked up by Pearson and Collins, in his opinion said:

"Thus, if human testimony is to be believed, there was no semblance of justification or excuse for the utterance and publication of these statements. It is evident that the purpose was to create a defense of the charge for which he was arrested and to do this by charging the appellee and the other officer with "cooking up a diabolical plot" against him, meaning thereby that these officers were perjurers and had suborned others to perjure themselves. In other words, by this libel, these officers were charged with the commission of a loathsome and reprehensible crime, a crime so revolting as to produce hatred, contempt and ridicule, and to destroy credibility and degrade and lessen confidence and respect for them in the community. Such statements could spring only from wilfulness and malice or an utter disregard of all moral and ethical actions of human conduct. These statements were therefore libelous per se.

"* * *

"If actionable per se, general damages need not be pled or proved, but are presumed to result. Travis v. Hunt, 224 Miss. 193, 79 So. 2d 734; Natchez Times Pub. Company v. Dunigan, supra; and the cases with which those opinions are documented.

"But malice was actually established in this case * * *.

"Under the evidence, there was clearly such publication in the newspapers and by letter as to fasten liability upon the appellant. See 53 C.J.S., Libel and Slander, Sec. 85, p. 137, where it says in part: 'The author of the defamation is liable for any secondary publication which is the natural consequence of his act; and this rule applies both to libel and slander.' See also 33 Am. Jur., Libel and Slander, Sec. 197, p. 185, of like effect; Newell, Libel and Slander, 4th Ed., p. 339, Manifestly, the case, on the merits, was properly

submitted to the jury, and the requested peremptory instruction was properly refused.''

The appellant's contention that the court erred in overruling the appellant's motion for leave to amend his answer so as to allege as an additional defense qualified privilege based on fair comment, has likewise been fully answered in the opinion rendered in the Collins case; and it is not necessary that we repeat here what was said in the Collins case on that point.

■■■ One other question remains to be considered by us on this appeal, and that is the question whether or not the amount of damages awarded by the jury is so excessive as' to require a reversal of the judgment and the granting of a new trial on that account. This Court has frequently stated that, in an action for libel or slander, the question as to the amount of damages to be awarded is peculiarly one for the jury. It is rarely the case that the compensatory damages to which the plaintiff is entitled in a case of this kind can be adequately measured by the extent of this pecuniary loss and, when malice is shown as in this case, exemplary damages may be awarded; and the amount of such damages awarded by the jury will not be disturbed by the court on appeal unless the amount is so excessive as to indicate bias or prejudice on the part of the jury.

The Court, in discussing the amount of the verdict in the Collins case, said: ''Under the law, damage is presumed to result from a malicious libel and, of course, it followed from the publication of this malicious libel. Reckless negligence in the infliction of a personal injury would afford a remedy to the victim. As was said in Jarnigan v. Fleming, supra, (43 Miss. 710), 'Character is far more sacred than property, and should be protected by courts and juries with watchful care. Persons who injure the character of others, ought to be no less answerable to justice than those who injure property.' ''

■■ ■ According to the evidence in this case the appellee was 32 years of age, was married and he and his wife had four children. The appellee graduated from Clarksdale High School in 1947. He attended University of Mississippi Law School thereafter, and obtained a law degree in 1951. He was admitted to the Bar and elected county attorney of Coahoma County in 1951, and served as county attorney for four years. He was defeated for reelection in 1955, but was again elected county attorney in 1959 for a second four-year term. His salary as county attorney was $4200 a year, and he expected to be a candidate for reelection in 1963. In addition to serving as county attorney, the appellant had been engaged in the general practice of law in the City of Clarksdale since 1952; and a large part of his practice had been derived from members of the colored race.

In view of the facts disclosed by the record we think that it cannot be said that the verdict in this case is so grossly excessive as to evince bias and prejudice on the part of the jury.

We find no reversible error in the record, and the judgment of the trial court is therefore affirmed.

Affirmed.

*Lee, P. J., and McElroy, Rodgers and Jones, JJ.,* concur.

## ON MOTION OF APPELLANT TO SET ASIDE FORMER JUDGMENT AND ENTER JUDGMENT FOR HIM AGAINST APPELLEE

Lee, C. J.:

The verdict of $25,000 and the judgment of the trial court in the above styled caused was affirmed by this Court on December 16, 1963. Henry v. Pearson, 253 Miss. 62, 158 So. 2d 695 (1963).

Thereafter the appellant Henry prosecuted an appeal to the Supreme Court of the United States, and that Court, at its October 1964 Term, 380 U. S. 356, 85 S. Ct. 992, 13 L. Ed. 892, as shown by its mandate of April 26, 1965, reversed the judgment theretofore rendered by this Court, awarded judgment against Thomas H. Pearson for costs of $100.00 on that appeal, and remanded the cause to this Court for proceedings not inconsistent with the opinion of that Court.

Consequently, this Court, in the circumstances, must yield to the judgment of the Supreme Court of the United States and its mandate therefor and direct that the judgment heretofore affirmed by this Court be reversed and judgment be rendered here for the appellant, Aaron Henry, and against Thomas H. Pearson, together with the costs adjudged in that Court in the sum of $100.00, and already taxed, and the costs to be taxed on the appeal to this Court from the trial court.

The motion is sustained and the judgment for appellee is reversed, and judgment for the appellant is rendered here.

All Justices concur.