Edward L. ARDOYNO, Jr., Plaintiff,

v.

James Robert KYZAR, Defendant.

Civ. A. No. 76–90.

United States District Court,
E. D. Louisiana.

Oct. 29, 1976.

Mora & Ardoyno, Robert O. Homes, Jr., August J. Bubert, Metairie, La., George M. Papale, Knight, D'Angelo & Knight, Gretna, La., for plaintiff.

Wiedemann & Fransen, L. D. Wiedemann, T.A., New Orleans, La., for L. S. Unger, H. M. Dulitz, S. J. Jacobs and K. W. Manuel.

Tucker, Schonekas & Garrison, Russell J. Schonekas, New Orleans, La., for James Robert Kysar.

Julian R. Murray, Jr., Milton LeBlanc, Jr., Arthur A. Lemann, III, New Orleans, La., for defendant.

ALVIN B. RUBIN, District Judge:

Plaintiffs in this action are Louisiana domiciliaries, practicing law in Louisiana. A substantial portion of their business, as the facts of this case suggest, involves representation of Mississippi domiciliaries. In

October, 1975, plaintiffs executed a contract in Louisiana to represent Mr. Fauver, a Mississippi domiciliary, in the courts of Louisiana. Mr. Kyzar, the defendant and also a Mississippi domiciliary, allegedly attempted to interfere with this contract through remarks made in Mississippi to Mr. Fauver. In addition to the action for interference with contractual relations, plaintiffs have alleged an action in slander based on the same remarks.

■ This case is before the court on the defendants' motion to dismiss pursuant to Rule 12(b) and 12(c), Fed.R.Civ.P. on the ground that the matter in controversy does not satisfy the $10,000 jurisdictional amount set by 28 U.S.C. § 1332, and on plaintiff's motion to amend his complaint to include additional allegations of contractual interference. The threshold issue in determining both these motions is whether the law of Louisiana or Mississippi is applicable. Mississippi law allows punitive damages for slander, *Henry v. Pearson,* Miss.1963, 158 So.2d 695, while Louisiana does not, *Giordano v. Tullier,* La.App.1962, 139 So.2d 15. Also, Louisiana does not recognize a cause of action for interference with a contract, *New Orleans Opera Guild, Inc. v. Local 174 Musicians Union,* 1961, 242 La. 134, 134 So.2d 901, while Mississippi does. *Bailey v. Richards,* 1959, 236 Miss. 523, 111 So.2d 402, 407.

Plaintiff's complaint will satisfy the jurisdictional amount only if Mississippi law, allowing punitive damages, applies. Likewise, plaintiff's allegations of contractual interference may stand only if Mississippi law is applicable.

■ Because this Court is sitting in Louisiana, it is bound to follow the Louisiana approach to conflicts of law. *Klaxon Company v. Stentor Electric Manufacturing Co.,* 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. The Louisiana Supreme Court, in the case of *Jagers v. Royal Indemnity Company,* La.1973, 276 So.2d 309, abandoned the doctrine of lex loci delicti, the place of the injury rule, as the exclusive principle of conflict resolution in torts. The court adopted the interest analysis approach for "false" conflicts.[1] Such a conflict "occurs when it is found that only a single state has an interest in the application of its law, and that the other state has no interest in the application of its law in the case." *Jagers,* supra, 276 So.2d at 311. The court did not explicitly state how it would resolve true conflicts should they arise.

A court interpreting the *Jagers* decision might discern its approval of three distinct, mutually exclusive, methods for resolving true conflicts. The first method is that of Professor Currie: simply to apply the law of the forum in every true conflict.[2] The second method is to revert to traditional analysis in true conflict situations, and to employ interest analysis only to ferret out

---

1. In light of the myriad approaches to modern interest analysis, it is significant that the court mentioned Professor Brainerd Currie. 276 So.2d, at 311, n. 2, quoting Couch, 45 Tul.L. Rev. 100, 106 (1970). *Jagers* has been criticized as leaving a vacuum in the law, 48 Tul.L. Rev. 149, 153 (1973), 49 Tul.L.Rev. 1, 2 (1974): its approval of Prof. Currie's approach to interest analysis provides one of the few indications of the approach the court itself may take.

2. See note 1, infra. According to Currie, whenever a true conflict exists, the forum ought to apply its own law. "The sensible and clearly constitutional thing for any court to do, confronted with a true conflict of interests, is to apply its own law . . . simply because a court should never apply any other law except when there is good reason for doing so." Currie, Selected Essays on the Conflicts of Laws, at 119 (1963 ed.). For Currie, the virtue of interest analysis is its ability to ferret out false conflicts, not its utility in resolving true ones. Approval of this method is intimated, not only by the reference to Currie, see note 1 infra., but by the statement that the court should not be deterred from "application of the law of the forum, to its citizens, when not otherwise prohibited." 276 So.2d, at 312. A court would be prohibited from applying its own law only in a false conflict when, by definition, it has no interest or minimum contact justifying the application of its law. See *Home Ins. Co. v. Dick,* 1930, 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926, and B. Currie, Selected Essays in the Conflicts of Law, at 271, suggesting that the Due Process Clause and the Full Faith and Credit Clause prohibit applying the law of the state that lacks an interest in a false conflict.

false conflicts.[3] The third method is to apply the principles of the Second Restatement of Conflicts (1969) to determine which of the interested states has the more significant relationship to the occurrence.[4] The first court to determine which of these competing methodologies would prevail was the Fifth Circuit, performing its *Klaxon* duties, in *Brinkley and West, Inc. v. Foremost Insurance Company*, 5th Cir. 1974, 499 F.2d 928. The court held Louisiana would opt for the approach of the Second Restatement. 499 F.2d, at 932.

Thus under the *Jagers-Brinkley* approach, conflict analysis consists of two distinct steps. The first is to determine whether a false or true conflict exists. If a false conflict exists, as in *Jagers*, the law of the state that has the exclusive interest is applied. If the conflict is a true one, the court proceeds to the second stage and applies the principles of the Second Restatement to determine which of the competing interests ought to prevail. This analysis must be performed separately for every significant issue in the case, for, under interest analysis, "cases can be expected to arise with some frequency where different states have the greatest concern in the determination of different issues." Reese, Depecage: A Common Phenomenon in Choice of Law, 73 Columbia L.Rev. 58, 59 (1973).

## I. INTERFERENCE WITH CONTRACTUAL RELATIONS

Application of Louisiana law is mandated by the *Brinkley* decision. *Brinkley* specifically held that Louisiana courts would not entertain a contractual interference action brought by a Louisiana resident against an outside predator, where that contract was made and performable within Louisiana. 499 F.2d at 935, n. 28.

Plaintiffs' attempt to distinguish *Brinkley* is unpersuasive. They contend that, because the employer is a client and the employee is a lawyer, and because the outside predator (Mr. Kyzar) is not a competing employer, Louisiana's policy of ensuring the mobility of the labor force will not be served by applying Louisiana law.[5] This policy has been achieved by permitting anyone who believes that the employee who is restricted by his contract would be best served by employment elsewhere to induce that party to abandon his contract, while preserving the employer's contract action against the errant employee. If Louisiana were interested in allowing only competing employers to jeopardize an employment relation, or not interested in promoting fluidity in the employment of lawyers, presumably it would have provided an exception for such situations, as it has for instances of fraud or deception.[6] It has not done so, and

3. The Fifth Circuit, while recognizing "Louisiana may jog this way at some later date," found nothing in *Jagers* to indicate that the court would refuse to apply interest analysis to true conflicts. *Brinkley,* supra, 499 F.2d, at 932 n. 14.

4. The *Jagers* court, 276 So.2d at 312, specifically referred to Restatement, Second, Conflicts of Law, § 6 (1969) which reads:

   "(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
   (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
   (a) the needs of the interstate and international systems,
   (b) the relevant policies of the forum,
   (c) the relevant policies of other interested states and the relative interests of those

states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied."

5. According to the *Brinkley* court, "For conflicts purposes, the Louisiana rule suggests a strong domestic interest in protecting the labor force of the state from impediments to the job mobility that could conceivably occur if the original employer could threaten suit against the outside predator." 499 F.2d, at 934.

6. *Kline v. Eubanks*, 109 La. 241, 243, 33 So. 211, 213 (1902). According to the *Brinkley* court, this is the *only* instance in which Louisiana courts would find an interference suit permissible. 499 F.2d, at 934, note 22.

a federal court should not entertain a diversity case that a state court would likely dismiss.

Even if *Brinkley* were not dispositive, the case would simply present a false conflict. Louisiana, as noted, has an interest in labor mobility. It has the interest of every forum in applying its own law for purposes of ease of application, familiarity, and sound judicial administration. Louisiana courts are understandably reluctant to interpret the law of a sovereign sister state.

Mississippi, on the other hand, has no interest in having its law applied. Its interest in protecting employment contracts from interference is necessarily limited to contracts that will be performed in Mississippi or executed there. See *Brinkley*, supra, 499 F.2d, at 935, n. 28.[7] It is only with regard to such contracts that Mississippi can promote stability of contractual relations in Mississippi, or the commercial attractiveness of Mississippi as a place to contract.

▪▪▪ The only situation in which Mississippi might pretend to an interest in a contract executed and to performed in an-

other state, would be one where a Mississippian is a party to that contract and invokes the benefits of Mississippi law. Such is not the case here, as it is a Louisiana plaintiff who seeks the benefits of Mississippi law. Simply put, Mississippi is interested only in protecting Mississippi residents [8] and Mississippi contracts.

Because Mississippi has no interest in having its law apply, and Louisiana does have such an interest, Louisiana law ought to prevail. There is no need to resort to the provisions of the Second Restatement to resolve this conflict—for no conflict exists.[9]

## II. THE ACTION FOR SLANDER

[12] Unlike the claim for interference with contractual relations, this cause involves a true conflict. As in the interference action, Mississippi has no interest in extending the protection of its law to a Louisiana plaintiff. Mississippi has an interest only in protecting Mississippi domiciliaries. However, it does maintain an interest in preventing intentional torts committed, and causing injury, within its boundaries.[10]

---

**7.** The court in *Brinkley*, supra, specifically limited the interest of a sister state to "the disruption of employment relations occurring *within its borders* . . ." 499 F.2d, at 935 (emphasis added). Additionally the court granted summary judgment for the defendant with respect to contracts "*made and performable* within Louisiana," Id., note 28, (emphasis added) as only Louisiana had an interest in such contracts.

**8.** It is for this reason that Mississippi had no interest in applying its law to the two Louisiana domiciliaries in *Jagers*.

A state's interest is always limited to its own domiciliaries or to acts that occur or have consequences within its borders. Professor Currie, in interpreting Massachusetts policy of protecting married women from contractual liability, asked what married women the legislature sought to protect by denying contractual capacity. He answered his own question, "Why, those with whose welfare Massachusetts is concerned, of course—i. e., Massachusetts married women." Currie, Selected Essays in The Conflict of Laws, supra, at 85.

**9.** In *Brinkley*, the court had to resort to the Restatement because many of the contracts were to be performed in states other than Louisiana. Those states had interests in protecting

employment relations occurring in their borders, and hence a true conflict existed. As to the contract that was executed and performed in Louisiana the court applied Louisiana law, without resorting to the Restatement. See note 7, infra.

**10.** This is not a reversion to a vested rights approach, but an attempt to assay Mississippi's interests. Those interests will often correspond with the state's territorial limits. Mississippi has an interest in what speed limits are observed in its borders regardless of the domicile of the wrongdoer. A state has an interest in deterring torts that cause harm within its borders. While the court in *Jagers* concluded that Mississippi had no interest in applying its law on intrafamily tort immunity to two Louisiana domiciliaries in a Mississippi accident, this is because intrafamily tort immunity affects the relation of the family members. Mississippi would maintain an interest in applying its traffic laws to the accident. Moreover, here the defamation was spoken by a Mississippian to a Mississippian—their relation is a proper concern of Mississippi.

Thus, the place of the harm, while a primary determinant under the vested rights approach, remains functional as regards applying interest

The alleged interference with contract caused no injury in which Mississippi could properly be interested. The slander, however, gave rise to an injury within Mississippi, for, although the defamed party resided in Louisiana, his reputation suffered in Mississippi.[11] Mississippi has an interest in applying its punitive damage provisions to deter such slander.[12]

Louisiana has an interest in avoiding speculative punitive damages in slander cases. If this interest is restricted to avoiding speculative damages against Louisiana domiciliaries, it would not be frustrated by applying Mississippi law in this case, and a false conflict would exist.[13] We shall assume, however, that Louisiana's interest is in protecting the integrity of its judicial system, rather than domestic defendants, from what it might consider inherently speculative awards. Having discerned an interest of both Mississippi and Louisiana in having their law applied, we turn to the principles of the Second Restatement to resolve the conflict.

Section 149 of the Second Restatement explicitly provides:

> In an action for defamation, the local law of the state where the publication occurs determines the rights and liabilities of the parties, except as stated in § 150 [on multistate defamation], unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

Hence, unless the factors enumerated in Section 6[14] dictate otherwise, the Second Restatement would resolve the conflict in favor of the law of Mississippi.

With all due deference to the Fifth Circuit's admonition that several of the Section 6 factors are unhelpful in the tort area, *Brinkley*, supra, 499 F.2d at 932, n. 15., we find that in this case the factors enumerated do indeed aid in the determination.

Application of Mississippi law would serve to promote: the needs of the interstate and international system (factor a), for, in deferring to Mississippi law, Louisiana would promote mutual respect and harmonious relations amongst the sister states in their attempts to reconcile competing interests;[15] the protection of justified expectations (factor d) that conduct in one's own state will be regulated by the law of that state;[16] the basic policies underlying

analysis to intentional torts. See Ehrenzweig, The Place of Acting in Intentional Multistate Torts: Law and Reason versus the Restatement, 36 Minnesota Law Review 1, at 5. It is for this reason that Professor Currie, in his famous article that gave rise to interest analysis, Married Women's Contracts: A Study in Conflict-Of-Law Method, 25 U.Chi.L.Rev. 227 (1958), used a contract case as his example to facilitate criticism of the traditional approach. The place of contracting is more often fortuitous (i. e., a plane over the high seas) relative to party expectation as to what law will govern, than is the place of tortious conduct.

**11.** As noted, a substantial portion of plaintiff's business involved representation of Mississippians. Without engaging in the metaphysics that earmarked traditional analysis, plaintiff's reputation could be injured only where the alleged slander was heard, and that was in Mississippi.

**12.** This corresponds with the single publication rule, which deems the injury to have occurred in the state of publication. See Prosser, Interstate Publication, 51 Michigan Law Review 954, 963–978. Cf. *Buckley v. New York Post*, 2d Cir. 1967, 373 F.2d 175.

**13.** According to § 149 of the Second Restatement, Illustration 2, the state where a defamation is published has an "obvious interest" in application of its law.

**14.** Should both states lack an interest in applying their law, as may sometimes be the case when the plaintiff is from a state imposing a lesser standard of conduct on the defendant than the law of the defendant's own state does, an "unprovided-for case" would exist. See Currie, Selected Essays in the Conflicts of Law, 152–153.

**15.** See note 4, infra, for an enumeration of the factors.

**16.** According to Professor Couch, ". . . it would seem that greater interstate harmony, as well as accommodation of expectations, could be achieved by looking to the place where the events transpired." Couch, Louisiana Adopts Interest Analysis: Applause and Some Observations, 49 Tulane L.Rev. 1, 13 (1974).

the particular field of law (factor e), namely that First Amendment considerations are promoted by applying the law of the place of publication, thereby avoiding a complex of litigation under varying and unanticipated law;[17] certainty, predictability and uniformity of result (factor f), for the choice of Louisiana as a forum would not suffice to change the applicable substantive law; and of course the policies of interested states (factor c), namely the Mississippi policy of deterring slander.

Only ease of judicial administration (factor g),[18] and the relevant policies of the forum (factor b), would be served by application of Louisiana law. Although courts ought not merely tally up how many of these factors favor each state, it is apparent that qualitatively as well as quantitatively, these factors favor application of Mississippi law, as presumptively provided for by Section 149.

Moreover, applying Mississippi law is "to subordinate, in the particular case, the external objective of the state whose internal objective will be least impaired." Baxter, Choice of Law and the Federal System, 16 Stan.L.Rev. 1, 18–19 (1963). See also, Crampton, Currie and Kay, Conflict of Laws 296–301 (1975). Louisiana has an obvious interest in protecting its domiciliaries from slander. It chose to subordinate that interest to its interest in avoiding speculative punitive damages. This subordinated interest, as well as Mississippi's external interest in deterring slander within its borders, will be attained by application of Mississippi law, while only the external interest of Louisiana in avoiding speculative damages will be frustrated.[19]

Additionally, regardless of any constitutional infirmities or questions of retroactivity, the Louisiana legislature has expressed its new intent that deterring slander through punitive damages is a more important interest.[20] It is the policy of the legislature, whether articulated over-broadly or belatedly, that the Court must discern and apply.[21] Hence, not only does Mississippi have the most significant relation to the cause of action for purposes of the Second Restatement §§ 6, 149, but the current policies of Louisiana and Mississippi regarding punitive damages for slander are best accommodated by application of Mississippi law.

Depecage, or the application of rules of different states to determine different issues in a case, has been well-accepted in

---

Professor Couch succinctly summarizes the present fact situation and recognizes that an individual acting within his home state, in conjunction with another domiciliary of that state, has expectations of being governed by the law of that state, which ought to override the interest of any other state in having its law applied. "The fact of plaintiff's domicile in State A, when everything else occurs in State B, should not be enough to justify the application of the law of A, even by an A court. To put it another way, when a defendant acts entirely within his home state, and has no connection with plaintiff's home state, then the defendant should be subject to his own law, regardless of whether it favors him or not." *Couch*, supra, at 10.

**17.** See Prosser, "Interstate Publication", 51 Michigan L.Rev. 959, 970–971, on the potential confusion and chill on free speech that would result if speech in one state could give rise to distinct causes of action under the laws of the other forty-nine states.

**18.** See *Turcotte v. Ford Motor Co.*, 1st Cir. 1974, 494 F.2d 173, 178.

**19.** Mississippi has no subordinated interest in avoiding speculative damages since its judicial system is not involved.

**20.** La.Civ.Code, Art. 2315.1, enacted July 29, 1976, provides punitive damages in slander actions.

**21.** This decision is not based on the applicability of this new law; therefore, it is unnecessary for us to reach the issues of retroactivity and constitutionality. However, as a general rule, a court in assaying conflicting interests ought be concerned with those policies articulated by the legislature at the time of the judicial determination, not at the time of the relevant transaction. If the legislature has no current interest in promoting the policy, there is little purpose in the court giving weight to it. The court must of course be concerned with the legitimate expectations of the parties that the law applicable at the time they acted will remain controlling for purposes of later judicial determinations. See Currie, Selected Essays, supra, at 643.

conflict analysis.[22] Accordingly, Louisiana law ought to govern the interference action and Mississippi law should govern the slander action.

Defendant's motion to dismiss for failure to satisfy the jurisdictional amount requirements of § 1332 is denied. Pursuant to Rule 12(c) Fed.R.Civ.P., judgment is granted for the defendant dismissing the claim for interference with their contractual relationship with Mr. Fauver. Although plaintiff has alleged intentional, malicious, and grossly reckless conduct, that is not sufficient to state an action under the exception of *Kline v. Eubanks*, 1902, 33 So. 211, for interference by fraud and deception. Plaintiff's motion to amend his complaint to include additional allegations of contractual interference is also denied.

22. See e. g., Cavers, The Choice-of-Law Process, 34–43 (1965); Reese, Depecage: A Common Phenomenon in Choice of Law, 73 Colum. L.Rev. 58 (1973); Wilde, Depecage in the Choice of Tort Law, 41 S.Cal.L.Rev. 329 (1968).