**Sharon Lee DOYLE, Paul J. Doyle and Isabelle Doyle, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 77–3528–RJK.

United States District Court,
C. D. California.

Jan. 28, 1982.

James F. McGahan, McGahan & Engle, Ventura, Cal., and Mary E. Schroeder, Romney, Drescher & Romney, Santa Paula, Cal., for plaintiffs.

Scott L. Gorland, Atty., Civil Division, U. S. Dept. of Justice, Washington, D. C., Andrea Sheridan Ordin, U. S. Atty., Frederick M. Brosio, Jr., Chief Asst. U. S. Atty., Civil Division, Dzintra I. Janavs, First Asst. U. S. Atty., Civil Division, Los Angeles, Cal., for defendant.

*Memorandum and Order*

HERBERT N. MALETZ, District Judge: [1]

## I. INTRODUCTION

This is an action for wrongful death, brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 *et seq.* [2] by the parents and surviving spouse of James Doyle. Mr. Doyle, a security guard at Ventura College, Ventura, California, was killed on March 23, 1975 by Carl Russell Carson who had been discharged by the United States Army on March 21, 1975. Briefly summarized, plaintiffs claim that Army medical personnel negligently failed to diagnose Carson as being psychotic and failed to warn Carson's potential victims as to his dangerousness. Plaintiffs also claim that Carson was discharged negligently and in violation of Army regulations.

## II. THE FACTS

The facts are these. Carson, then 19 years old, was inducted into the United States Army on January 31, 1975, whereupon he was assigned to Fort Polk, Louisiana for basic training. Carson disliked the Army and within two weeks of his induction deliberately violated his company commander's orders in the hope of precipitating a discharge from the Army. As a consequence of this incident, Carson was charged with two violations of the Uniform Code of Military Justice (UCMJ).

In the course of subsequent conversation with his company commander, Captain Melvin G. Engstrom, Carson said he wanted a discharge because he had joined the Army in order to learn to kill people, but the Army was not teaching this to him quickly enough. He also indicated that his thoughts about killing persons vacillated and that although he didn't have the desire to kill at that moment, his feelings were apt to change. Because of these statements, Captain Engstrom asked the unit chaplain, Captain Richard H. Whaley, to speak to Carson.

Chaplain Whaley met with Carson who stated that he had joined the Army to learn to kill and indicated that he would use the knowledge to kill his parents. While he appeared to be resentful of authority, Carson did not mention any intention to kill police officers or Ventura College security guards. And Carson indicated that while he had violent thoughts at the time he entered the Army, he no longer felt that he wanted to learn to commit acts of violence. Chaplain Whaley concluded that Carson was an anti-social person with little respect for authority and that he should be discharged as soon as possible. Chaplain Whaley reported this to Captain Engstrom and also recommended that Carson see a psychiatrist.

On February 11, 1975, Captain Engstrom ordered Carson to see an Army psychiatrist.

---

1. Judge of the United States Court of International Trade sitting by designation pursuant to 28 U.S.C. § 293(b).

2. In pertinent part 28 U.S.C. § 1346(b) provides that the district courts:

    shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages ... for ... death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

    28 U.S.C. § 2674 provides in part:

    The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances ....

As it turned out, before being examined by a psychiatrist, Carson was seen by three Army counselors, Daniel V. Landsverk, Gary Kerns and Gregory T. Crow, whose job it was to interview and screen individuals who were referred to the Fort Polk Hospital for psychiatric examination. The first interview was conducted on February 11, 1975 by Landsverk to whom Carson stated that he did not like people, that since approximately 15 years of age he had had sporadic violent feelings, and that he had joined the Army to learn to kill. Landsverk concluded that Carson did not have any present intent to kill but that he had some homicidal tendencies which merited evaluation. But Landsverk was also not able to rule out the possibility that Carson was malingering in order to obtain a discharge.

On the following morning, Carson was interviewed by Kerns. Carson once again discussed his ideas about killing persons but did not threaten anyone, and Kerns' impression was that he posed no immediate danger.

Carson was seen later that day by Crow who spent about an hour with him. Carson described himself to Crow as a loner, with difficulty in relating to his parents, peers and authority figures and expressed his desire to kill as part of a political theory for the bringing down of the government which he said was corrupt. Crow concluded that Carson's thoughts demonstrated a preoccupation with violence which was not directed at himself or any individuals. Crow did not detect any psychosis or severe neurosis, but he felt that Carson's judgment and insight were "slanted."

On February 13, 1975, at the insistence of Captain Engstrom, Carson was finally seen by an Army psychiatrist, Dr. Robert W. Johansen. During the interview, Carson told of his recurring interest in violence, stated that he had joined the Army to learn to kill people and indicated he had thought about killing his parents. Carson told Dr. Johansen, however, that he did not presently feel a need to kill. Carson additionally stated that he felt isolated from other people, that he had to look out for himself and that other persons did not matter.

Dr. Johansen concluded that Carson had a relative lack of feeling about killing. Also Carson appeared to be very desirous of being discharged from the Army, and Dr. Johansen therefore suspected that Carson's statements about killing were made in a deliberate attempt to obtain a discharge.

Dr. Johansen nonetheless decided that Carson should be observed for evidence of psychotic behavior, and on February 13, 1975 Carson was admitted to the Neuropsychiatric Ward of the Fort Polk Hospital. In an attempt to alleviate Carson's anxiety, Dr. Johansen ordered the administration of thorazine, an antipsychotic drug and tranquilizer, at the rate of 50 milligrams a day, four times a day. At the ward, the nursing staff made daily notes on his behavior and an oral report was given each morning to Dr. Johansen. The nurses found Carson to be cooperative and oriented and adjusting well to the ward. While there he told the nursing staff that he wanted a discharge from the Army and he repeated his earlier statement that he joined the Army because of a desire to kill people. After seeing Carson on rounds, Dr. Johansen concluded that Carson verbalized his aggressive fantasies in order to shock people and compensate for a very inadequate personality. On February 18, 1975, Dr. Johansen ordered him discharged from the hospital.

Upon his discharge from the hospital, Carson briefly went AWOL and when he returned to his unit he was relieved from recruit training and assigned office work and light maintenance duties. He performed these duties for approximately four weeks, during which he was cooperative and functioned without apparent incident.

On the basis of his examination and hospitalization, Dr. Johansen found that Carson was oriented as to person, place and time and that his associations were appropriate. There was no indication of delusions or hallucinations although Carson's affect appeared inappropriate to his speech. Additionally, Dr. Johansen took note of Carson's aggressive expressions, lack of social conscience, difficulty with authority figures and failure to obey orders.

Dr. Johansen's diagnosis was that Carson's judgment and insight were chronically poor and that he had a chronic and severe anti-social character disorder which seriously impaired his ability to serve in the Army. Importantly, Dr. Johansen also decided that Carson was in touch with his environment, that he was responsible for his actions and that he was not psychotic.

In making his evaluation, Dr. Johansen observed that Carson apparently had little moral conscience and a lack of feeling about killing. This observation was offset by Carson's cooperation and lack of aggression while under Dr. Johansen's care. Additionally, Carson was in touch with his environment. Considering these factors and considering Carson's repeated requests for a discharge, Dr. Johansen concluded that Carson's violent statements were manipulative attempts to make himself appear undesirable.

As was noted earlier, Carson had previously been charged with two violations of the Uniform Code of Military Justice. These charges were referred to a special court martial and on February 26, 1975, pursuant to legal advice, Carson requested, in lieu of a court martial, a discharge for the "good of the service" pursuant to the provisions of Chapter 10, Army Regulation (AR) 635–200.

Carson's request for a Chapter 10 discharge was considered by Major General Robert Haldane, the commanding general of Fort Polk who was also its general court martial convening authority. Prior to making his decision, General Haldane considered Carson's medical and administrative files and the recommendation of Captain Engstrom. Additionally, General Haldane's legal advisor, Lt. Colonel Richard Boller, spoke personally both to Carson and Dr. Johansen about Carson's violent statements. After reviewing the records and discussing the case with Colonel Boller, General Haldane concluded that Carson's statements were those of a recruit who could not adjust to the Army and whose objective was to obtain a discharge. Accordingly, on March 12, 1975, General Haldane directed that Carson be issued a general discharge.

Upon his discharge on March 21, 1975, with funds provided by the Army, Carson returned to his home in Ventura, California. Two days later, on March 23, 1975, Carson took his hunting rifle and walked to the campus of Ventura College, located near his home. There, encountering Mr. Doyle who was patrolling the campus, Carson acted out a recurring fantasy by shooting and killing Mr. Doyle and by taking his handgun. Carson was subsequently convicted of murder by a jury which rejected his insanity defense.

Additional facts developed at trial of the present case established that Carson is an extremely intelligent man whose childhood was marked by intense feelings of insecurity and inadequacy and by a preoccupation with violence. During adolescence, Carson's fantasies began to be constructed around his view of the government as corrupt and evil. On at least one occasion, Carson described to a high school friend how he thought about killing his parents, then going to Ventura College, where his father was an instructor, and killing a security guard there for the purpose of taking his magnum pistol. In Carson's view, the magnum pistol would be an appropriate weapon with which he could go into the hills and start a revolution. At other times he fantasized about committing crimes and being involved in gun fights with the police. Surprisingly, Carson was not a discipline problem at home or at school and had never committed any acts of violence or been in trouble with juvenile or adult authorities.

## III.  SUMMARY OF CONTENTIONS

It is against this background that plaintiffs advance several different theories of liability. First, plaintiffs allege that Dr. Johansen negligently failed to determine that Carson was seriously dangerous to third persons. In this connection, it is claimed that Dr. Johansen failed to conduct a reasonable interview and evaluation, neglected to take a proper history of Carson's disorder and consequently failed to warn Carson's intended victims. Plaintiffs also

allege that Dr. Johansen negligently failed to treat Carson for his disorders and negligently released Carson from the Fort Polk psychiatric facility. Additionally, plaintiffs claim that Dr. Johansen violated Army regulations governing the care of psychiatric patients and that the violations of these regulations constituted negligence per se. Finally, in a related claim, plaintiffs allege that the discharge of Carson from the Army pursuant to AR 635–200, Chapter 10, was in violation of that regulation and negligent.

Defendant responds to these claims by denying all negligence, by denying that plaintiffs have any rights under the Army regulations they rely upon, by denying that these regulations were violated, and by denying that any duty was owed to decedent. Additionally, defendant argues that General Haldane's decision to discharge Carson falls within the discretionary function exception of the Tort Claims Act. On this basis, defendant argues that no liability may be imposed for any negligence of General Haldane. What is more, defendant claims the discretionary function exception also protects from liability the alleged negligence of Dr. Johansen, upon whose examination the General relied in determining to discharge Carson. As a separate defense, defendant also argues that because of his status as court martial convening authority, General Haldane's decision to discharge Carson is entitled to judicial immunity.

## IV. THE DISCRETIONARY FUNCTION AND JUDICIAL IMMUNITY DEFENSES

█ Given these claims and defenses, it is appropriate to begin by examining the applicability to this case of the discretionary function exception of the Federal Tort Claims Act. See 28 U.S.C. § 2680(a). That exception, which provides that the government shall not be liable for acts or omissions to act which are within the discretion-ary function or duty of any federal agency or employee,[3] see *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); *Harris v. United States*, 205 F.2d 765 (10th Cir. 1953), insulates high level policy judgments from Tort Claims Act liability. See *Coates v. United States*, 181 F.2d 816 (8th Cir. 1950); *Sickman v. United States*, 184 F.2d 616 (7th Cir. 1950), *cert. denied*, 341 U.S. 939, 71 S.Ct. 999, 95 L.Ed. 1366 (1950), *rehearing denied*, 342 U.S. 843, 72 S.Ct. 21, 96 L.Ed. 637 (1950). But where the decision occurs at the operational level of government, the exception provides no protection although discretion and judgment may in fact have been exercised. See *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *American Exchange Bank of Madison, Wis. v. United States*, 257 F.2d 938 (7th Cir. 1958); *Eastern Air Lines v. Union Trust Co.*, 221 F.2d 62 (D.C.Cir.1955), *aff'd*, 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955); *Friday v. United States*, 239 F.2d 701 (9th Cir. 1957); *United Air Lines v. Wiener*, 335 F.2d 379 (9th Cir. 1964), *cert. dismissed*, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964).

█ In the court's view, all the conduct with which we are concerned here occurred at the operational level and the discretionary function exception therefore does not apply. Dr. Johansen was not called upon to formulate policy but to evaluate a patient. See *Jackson v. Kelly*, 557 F.2d 735 (10th Cir. 1977). Similarly, General Haldane's decisions involved the implementation and not the formulation of policies which were already embodied in AR 635–200. Further, this case is centered upon plaintiffs' claims that the Army failed to act properly with regard to the danger posed by a particular serviceman under particular circumstances. And the courts have uniformly held that the failure of federal actors to respond appropriately to a particular danger falls outside the scope of the discretionary function exception. See *United States v. State of Washington*, 351 F.2d 913 (9th Cir. 1965);

---

3. 28 U.S.C. § 2680(a) provides in part that Tort Claims Act liability may not be based upon: the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*United Air Lines, Inc. v. Wiener*, 335 F.2d 379 (9th Cir. 1964), *cert. dismissed*, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964); and *United States v. White*, 211 F.2d 79 (9th Cir. 1954).

■ Nor is General Haldane's decision to discharge Carson protected by the doctrine of judicial immunity. As noted, Carson was discharged pursuant to AR 635-200, Chapter 10, which permits the discharge of soldiers who have committed serious violations of the UCMJ. Emphasizing that Carson was subject to court martial for his offenses and that General Haldane was the court martial convening authority at Fort Polk, defendant argues that the decision to grant Carson's discharge is protected by the doctrine of judicial immunity. However, General Haldane's decision to grant Carson's discharge was essentially an administrative determination that Carson was not likely to be a good soldier and that the Army would benefit from his release from service. This decision did not involve any of the General's powers as court martial authority to weigh evidence, judge the credibility of witnesses, determine questions of fact or decide punishment. In short, it was a non-judicial determination to which judicial immunity does not apply. See *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978).

**4.** Sections 6 and 145 of the Restatement (Second) of Conflict of Laws (1969) provide as follows:

§ 6. Choice-of-Law Principles
(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
    (a) the needs of the interstate and international systems,
    (b) the relevant policies of the forum,
    (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
    (d) the protection of justified expectations,
    (e) the basic policies underlying the particular field of law,
    (f) certainty, predictability and uniformity of result, and
    (g) ease in the determination and application of the law to be applied.

## V. THE APPLICABLE STATE LAW

■ We turn next to a consideration of what law is to be applied here. The Federal Tort Claims Act requires that this case be determined in accordance with state law, see 28 U.S.C. § 2674, and this court has already determined that Louisiana choice of law principles govern the action. See Memorandum of Decision and Order of December 12, 1978. Plaintiffs argue that Louisiana's choice of law principles require the application of California's substantive law while defendant argues that Louisiana's substantive law is mandated.

For the resolution of choice of law problems, Louisiana has explicitly adopted the interest analysis approach of the Restatement (Second) of Conflict of Laws (1969). *Jagers v. Royal Indemnity Co.*, 276 So.2d 309, 312 (La.1973). See also *Brinkley & West, Inc. v. Foremost Insurance Co.*, 499 F.2d 928 (5th Cir. 1974); *Ardoyno v. Kyzar*, 426 F.Supp. 78 (E.D.La.1976); *Wayne v. Olinkraft, Inc.*, 293 So.2d 896 (La.App.1974). Following *Jagers* and the Restatement (Second) of Conflict of Laws, §§ 6 and 145, to decide the applicable law this court must determine which state has the most significant relationship to the occurrence and the parties involved here.[4]

§ 145. The General Principle
(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
    (a) the place where the injury occurred,
    (b) the place where the conduct causing the injury occurred,
    (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
    (d) the place where the relationship, if any, between the parties is centered.
These contacts are to be evaluated according to their relative importance with respect to the particular issue.

We begin by noting that both California and Louisiana have a significant relationship to the parties and the events. As for California, both Carson and Doyle were California residents. Additionally, Doyle's wife and parents, plaintiffs here, are California residents. California, therefore, has an interest in the compensation of decedent's survivors.

Turning to a consideration of Louisiana's interests, that state has an interest in regulating the conduct of physicians practicing within its borders. And although Army physicians are employed in federal facilities, they not only provide medical care to servicemen but also to their civilian dependents. See AR 40–3, Chapter 4. Significantly, claims by these dependents for injuries caused by negligent medical care are determined in accordance with state law. See *Jackson v. Kelly*, 557 F.2d 735 (10th Cir. 1977). Thus, Louisiana retains an interest in regulating the conduct of Army physicians in spite of their federal character.

Additional factors point toward the application of Louisiana law here. Briefly stated, a main contention of plaintiffs is that the Army should not have discharged Carson without providing care for him. As to this claim, it must be considered that soldiers discharged from a Louisiana base are under no obligation to return to their home state and may remain in Louisiana. And even those discharged soldiers who do return to their home states of necessity spend their first hours outside the Army in Louisiana. Thus, Louisiana has an interest in any rule governing the release of disturbed soldiers from bases within its borders.

Of course, any of the fifty states could also be affected by the release of disturbed servicemen from a Louisiana base. Recognition of that interest would require the Army to determine the likelihood of a particular soldier returning to his home state and then vary its standards for discharge in order to conform to the particular state's law.

A similar problem is posed by plaintiffs' claim that Dr. Johansen improperly failed to probe Carson for homicidal threats and improperly failed to warn of the danger to Mr. Doyle. In the court's view, it is important that psychiatrists be readily able to ascertain their duties with regard to the conscious decisions they must make as to these matters. And to determine these duties, not in accordance with the law of the state in which the psychiatrist practices, but rather in accordance with the law of the state the patient may return to, would render psychiatrists subject to varying and uncertain standards as to the conscious decisions they must make regarding the treatment and examination of their patients and, in particular, would require Army psychiatrists to be familiar with the laws of the fifty states.

Fortunately, neither § 6 nor § 145 of the Restatement mandates such a result here. Section 145(2)(b) explicitly makes relevant consideration of "the place where the conduct causing the injury occurred." That place was, of course, Louisiana. And § 6(2)(f) makes relevant to the choice of law the factors of "certainty, predictability and uniformity of result." While both Louisiana and California have important interests here, what is decisive is the need for psychiatrists and the Army to be able to readily ascertain the law that will be applied to actions such as those challenged here. Accordingly, the court determines that the state which has the most significant relationship to the occurrence and to the parties is Louisiana where the conduct allegedly causing the injury took place.

## VI. CONSIDERATION OF THE MERITS

### A. *Louisiana Law*

We turn then to a consideration of plaintiffs' claims under Louisiana law. In general, the Louisiana courts have shown great reluctance to impose liability because of a failure to protect the public from a dangerous individual. In rejecting such claims, the Louisiana courts have focused consideration upon whether defendant had any duty to protect the plaintiff and whether the breach of that duty was the proxi-

mate cause of plaintiffs' injuries. The leading Louisiana case concerning dangerous patients is *Cappell v. Pierson*, 15 La.App. 524, 132 So. 391 (2d Cir. 1931), which held that the negligent release of an apparently dangerous patient was not the proximate cause of the murder committed by the patient on the day of his release. Similarly, in *Graham v. State, Health & Social, Etc.*, 354 So.2d 602 (La.App. 1st Cir. 1977), a patient who was negligently permitted to escape from a mental hospital attacked and injured a child. The court held that no recovery could be had for the attack, which occurred one day after the escape and one hundred miles away. In the court's words:

> We find that no duty was owed Appellant in this case and that the risk of harm intended to be protected against does not extend to the harm which befell ... [the victim]. Despite threats to do so, ... [the patient] had never before attacked anyone, except for the one noted incident which did not involve a weapon as such. The incident in question occurred several hours after escape and at a place more than 100 miles from the institution. We presume that ... [the patient] armed himself with the knife after his escape. The attack, hours after escape, upon a 12 year old boy who was a complete stranger, in a city 100 miles distant from where ... [the patient] was institutionalized, was so unforeseeable and unpredictable that to hold the incident within the risk of harm sought to be protected against would impose total, unqualified liability on the State for any harm caused by an escaped inmate under any and all circumstances, irrespective of intervening time and distance. As a matter of policy, we are not prepared to extend liability to this degree. We find, therefore, that ... [the victim] does not fall within the class of those afforded protection against the risk of harm involved in this instance.

*Id.* at 605–606.

In a related area, the Louisiana courts have also rejected liability in cases concerning the negligent release and escape of prisoners. For example, in *Frank v. Pitre*, 353 So.2d 1293 (La.1977), the Louisiana Supreme Court held that the negligent release of a violent prisoner was not the proximate cause of the death of a police officer killed by the prisoner on the day of his release. The court stated:

> It is not enough to say that if ... [the prisoner] had not been released under the sheriff's policy of weekend passes, the tragedy would not have occurred. If ... [the prisoner's] friend had not given him a ride to town the shooting would not have happened. There must be something more; there must be a closer connection between the act of the defendant and the injury of the plaintiff .... [E]ven though a reasonable man might have concluded, if he had thought about it, that a prisoner allowed to go home on Saturday might have gotten into a brawl in a saloon and shot a policeman ... the claimed cause of the injury (the release of ... [the prisoner]) did not sufficiently contribute to the injury to create liability in defendant.

*Id.* at 1296.

Similarly, in *Reid v. State*, 376 So.2d 977 (La.App. 1st Cir. 1979), an escaped prisoner seriously injured one person and killed another during a robbery occurring eleven days after and 60 miles from the escape. Following the teachings of *Frank v. Pitre*, *supra*, the court rejected plaintiffs' claims:

> Plaintiffs argue strenuously that ... [the prisoner's] dangerous tendencies should have been recognized and guarded against. As stated above, we accept the conclusion that the defendant was negligent. Insofar, however, as the same contentions are made to establish the ambit of the duty and the breach thereof by establishing foreseeability, we doubt that the record pointed to vigorously by the plaintiffs supports that conclusion. While there was evidence of threats against persons, these were threats only .... In *Frank v. Pitre*, *supra*, the Supreme Court's decision was made despite a finding by the trial court and the Court of Appeal that the prisoner was " 'without question', a man of violent propensities." That seems at least equally

grave as the supported charges against ... [the prisoner]. We therefore cannot accept plaintiffs' conclusion that the duty was extended to plaintiffs herein because of the foreseeability that ... [the prisoner] would commit a violent act.

\* \* \* \* \* \*

Whether the problem be stated as one of ambit of duty, of proximate cause, of adequate cause, of legal cause or of other cause, the ultimate question to be decided by the court is whether as a matter of policy, recovery should be allowed when the damage is caused eleven days and sixty miles away.... Obviously, the line has to be drawn some place. The Supreme Court, we believe, in *Frank v. Pitre*, supra, has drawn the line closer than in the present case. We follow that jurisprudence.

*Reid v. State* at 978–979.

As these cases make plain, the Louisiana courts place great emphasis upon the physical and temporal proximity of the relevant events. Apparently in the absence of harm flowing directly and immediately from the event, the Louisiana courts do not view the release or escape of a patient or prisoner as the proximate cause of injuries committed by that person. Here, Mr. Doyle was killed over a thousand miles away from where the allegedly negligent acts of defendant were committed. Additionally, the shooting of Mr. Doyle occurred two days after Carson's discharge from the Army and over one month after his discharge from the Fort Polk Hospital. Considering these facts, the court concludes that the courts of Louisiana would not permit recovery here for plaintiffs' claim that Carson was negligently released from the Fort Polk Hospital or from the Army. Moreover, there is no reason to expect that the Louisiana courts would apply a less stringent view of proximate cause to injuries to third persons which follow the negligent misdiagnosis—as opposed to the release or escape—of a patient. Here, even assuming that Dr. Johansen's examination and diagnosis were negligent, it is apparent that under Louisiana law these events and the death of Mr. Doyle occurred too far apart in time for the former to be the proximate cause of the latter.

■ It only remains to apply Louisiana law to plaintiffs' claim that Dr. Johansen failed to warn Mr. Doyle of Carson's homicidal intent. First, the Louisiana courts have not yet recognized a duty of therapists to warn third persons of patients' dangerous intentions. Further, Carson never told either Dr. Johansen or any of the counselors who interviewed him of his intention to kill a Ventura College security guard, or Mr. Doyle in particular. For this reason, as will be shown more fully below, even if Louisiana did recognize a duty to warn, it would be inapplicable here.

B. *California Law*

■ Because the choice of law question presented by this case is not without some difficulty, it is appropriate to note that even if California law were applied here plaintiffs would nonetheless not prevail because under California law defendant owed no duty of care to a member of the general public such as Mr. Doyle. Thus, in *McDowell v. County of Alameda*, 88 Cal.App.3d 321, 151 Cal.Rptr. 779 (1979), where an escaped mental patient killed a member of the general public, the court held that the hospital which had permitted the escape owed no duty to the decedent:

> Decedent was a third person whose life was not known ... to be threatened by ... [the patient] .... Respondents do not owe a duty to [protect] society because ... [the patient's] behavior may constitute a danger to any person.

*Id.* 151 Cal.Rptr. at 781–782.

Very similar is *Hooks v. Southern Cal. Permanente, Etc.*, 107 Cal.App.3d 435, 165 Cal.Rptr. 741 (1980), which concerned the duty of a hospital to control a disturbed person, in that case an employee. For such a duty to exist, the court stated, the defendant must be put "on notice that a specific, rather than a generalized, risk exists. Moreover, one must know that the target of the risk is an identifiable and foreseeable victim." *Id.* 165 Cal.Rptr. at 746.

Nor do the cases relied upon by plaintiffs establish a contrary rule. See *Merchant's Nat. Bank & Trust Co. of Fargo v. United States*, 272 F.Supp. 409 (D.N.D.1967); *Fair v. United States*, 234 F.2d 288 (5th Cir. 1956); *Underwood v. United States*, 356 F.2d 92 (5th Cir. 1956); *Vistica v. Presbyterian Hospital*, 67 Cal.2d 465, 62 Cal.Rptr. 577, 432 P.2d 193 (Cal.1967). While each of these decisions does involve an injury caused by a mentally disturbed person, in those cases, unlike here, the victim was readily identifiable before the incident. And while a duty to the public with regard to a probationer receiving care at a psychiatric institute was found in *Semler v. Psychiatric Institute of Washington, D. C.*, 538 F.2d 121 (4th Cir. 1976), *cert. denied*, 429 U.S. 827, 97 S.Ct. 83, 50 L.Ed.2d 90 (1976), that duty was explicitly traced to language in the court's order of probation indicating that one of its purposes was the protection of the public. In *Greenberg v. Barbour*, 322 F.Supp. 745 (E.D.Pa.1971), the specific issue of whether defendant had any duty to the victim is not discussed and the opinion merely denies summary judgment on the basis of there being material facts in dispute. Finally, in *Buford v. State*, 104 Cal. App.3d 811, 164 Cal.Rptr. 264 (1980), the court merely indicated that the issue of whether the victim was indeed foreseeable was best reserved for trial. None of these cases support the proposition that the Army owed a duty to Mr. Doyle who was not foreseeably and identifiably threatened by Carson.

Specifically considering the claim that Dr. Johansen failed to warn Mr. Doyle, under California law such a duty arises only when the victim is foreseeable and identifiable. As was stated in *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 345 (Cal. 1976), when a therapist:

> ... does in fact determine, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, he bears a duty to exercise reasonable care to protect the foreseeable victim of that danger.

That a duty to warn arises only when the potential victim is known and foreseeable is made clear by *Thompson v. County of Alameda*, 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728 (Cal.1980). In *Thompson*, the county released from custody a juvenile known to have "latent, extremely dangerous and violent propensities regarding young children." *Id.* 167 Cal.Rptr. at 72, 614 P.2d at 730. Although it was known "that sexual assaults upon young children and violence connected therewith were a likely result of releasing ... [the juvenile] into the community," *id.* 167 Cal.Rptr. at 72, 614 P.2d 730, the juvenile was discharged to his mother's custody. Within twenty four hours, he sexually assaulted and murdered a five year old child residing next door. In rejecting a claim for damages and holding that the county had no duty to warn the juvenile's mother's neighbors, the California Supreme Court distinguished *Tarasoff* by noting that the decedent in that case was the "known and specifically foreseeable and identifiable victim of the patient's threats." *Thompson*, 167 Cal.Rptr. at 76, 614 P.2d 734. And the court stated that "[a]lthough the intended victim as a precondition to liability need not be specifically named, he must be 'readily identifiable.'" *Id.* 167 Cal.Rptr. at 76, 614 P.2d 734. Because the juvenile in *Thompson* had made "*nonspecific threats of harm directed at nonspecific victims*," the court concluded that the defendant had no duty to warn of the juvenile's dangerous intentions. *Id.* 167 Cal.Rptr. at 77, 614 P.2d 735. [Emphasis in original.]

Turning to the case at hand, unlike *Tarasoff*, the victim here was not specifically foreseeable and identifiable. What was present here, as in the *Thompson* case, was only a nonspecific threat of harm directed at nonspecific victims. Because of this, the duty to warn did not arise in this case.

Plaintiffs attempt to overcome the fact that Mr. Doyle was not an identifiable and foreseeable victim by arguing that specific inquiries would have revealed that Carson's intended victim was a security guard at Ventura College. As to this, plaintiffs

presented testimony by psychiatrists which attempted to reconstruct his mental state when he was in the Army. On this basis, plaintiffs argue that had Dr. Johansen conducted his interview differently, Carson's threatening thoughts regarding Ventura College security guards would have been discovered. The court concludes, however, that the evidence offered in support of this theory is too speculative to support recovery under California law.

Of course, the duty to warn victims is dependent upon a determination that the patient is dangerous. *Tarasoff*, 131 Cal. Rptr. at 25, 551 P.2d at 345. But plaintiffs have not proven that Dr. Johansen should have determined that Carson was dangerous. In claiming that Dr. Johansen should have done so, plaintiffs, as noted above, rely heavily upon conjectural testimony from psychiatrists who did not examine Carson while he was in the Army as to what his mental status was at that time. However, the reliable facts, that is that Carson made generally threatening statements, had a preoccupation with violence, and after his discharge killed Mr. Doyle, do not by themselves prove that Dr. Johansen should have discovered that Carson was dangerous.

That a person makes threatening statements is not enough. Such statements are commonly expressed to psychiatrists and merely pose but do not answer the difficult question of whether or not danger is actually present. And that question, which is generally difficult for psychiatrists to answer, *Tarasoff*, 131 Cal.Rptr. at 25, 551 P.2d at 345, is even more difficult to answer if the subject has never committed an assaultive act. See Ennis and Litwack, *Psychiatry and the Presumption of Expertise: Flip-*

*ping Coins in the Courtroom*, 64 Cal.L.Rev. 693, 711 (1974). Here, Carson had no history of violence and was not violent during the five days he was observed in the Fort Polk Hospital or during the four weeks preceding his discharge.

Plaintiffs stress, however, that Dr. Johansen should have quesioned Carson more closely about his past history of threatening ideas. As to this, Dr. Johansen devoted his entire initial interview with Carson to a discussion of Carson's statements about killing and his desire to obtain a discharge, which were apparently Carson's two primary concerns at that time. To mandate that a therapist pursue a particular litany of questions during an interview would, in this court's view, violate the *Tarasoff* court's admonition that therapists, within the bounds of professional competence, are entitled to broad discretion as to the manner in which they conduct their examinations. *Tarasoff*, 131 Cal.Rptr. at 25, 551 P.2d at 345. That after his discharge Carson killed Mr. Doyle does not constitute proof that Dr. Johansen should have discovered his dangerousness. As the *Tarasoff* court stated: "Proof, aided by hindsight that ... [the therapist] judged wrongly is insufficient ...." *Id.*, 131 Cal.Rptr. at 25, 551 P.2d at 345.

■ Focusing upon the release of Carson from the Army we next consider whether defendant's alleged violation of various Army regulations constitutes negligence per se pursuant to section 669 of the California Evidence Code as claimed by plaintiffs.[5] To prevail upon this claim, plaintiffs must, among other things, establish that the regulation in question was violated; that the injury was the type the regulation

---

5. In pertinent part, § 669 provides as follows:
   Failure to exercise due care
   (a) The failure of a person to exercise due care is presumed if:
   (1) He violated a statute, ordinance, or regulation of a public entity;
   (2) The violation proximately caused death or injury to person or property;
   (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and

   (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.
   (b) This presumption may be rebutted by proof that:
   (1) The person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law; ...

sought to prevent; and that the person suffering the injury was among the class sought to be protected. See *Kane v. Hartford Acc. & Indemn. Co.*, 98 Cal.App.3d 350, 159 Cal.Rptr. 446 (1979) and *Olsen v. McGillicuddy*, 15 Cal.App.3d 897, 93 Cal.Rptr. 530 (1971).

Plaintiffs first rely upon AR 40–3, para. 6–22(b) which indicates that psychotic soldiers requiring hospitalization who are ineligible for Veterans Administration care are, upon discharge, to be transferred to the care of their next of kin or to a state hospital. This regulation makes no distinction between dangerous and non-dangerous patients and, read as a whole, para. 6–22 is concerned with insuring care for all, and not just psychiatric, patients. Thus, the regulation's intent is to provide medical care to discharged servicemen, not to protect any class of persons from injury and its violation therefore would not constitute negligence per se here. Additionally, the regulation only requires that care be arranged for discharged servicemen when there is a determined need for it. Here, since no such determination was made, the regulation was not violated by Carson's discharge to the public.

■ Plaintiffs next claim that General Haldane's authorization of Carson's discharge pursuant to Chapter 10 of AR 635–200, exceeded the scope of that provision. Chapter 10 establishes a procedure whereby individuals who have committed violations of the UCMJ and who are not likely to make good soldiers may be discharged as opposed to court martialed. Plaintiffs contend that Chapter 10 is reserved for the discharge of soldiers who have committed serious offenses of the UCMJ and that Carson's in-service offenses were not of sufficient gravity to permit him to be discharged pursuant to that Chapter. On this issue,

the court credits the testimony of Captain Engstrom that Carson's offenses were indeed serious and punishable by imprisonment.

Plaintiffs also argue that Carson should not have been discharged pursuant to Chapter 10 because he was dangerous and because Chapter 10 does not insure the provision of medical care following separation from the Army. However, before determining to discharge Carson, General Haldane considered Carson's entire military file including Dr. Johansen's diagnosis, which did not contain a finding of dangerousness or psychosis. Furthermore, specific inquiries of Dr. Johansen made at General Haldane's direction by his legal officer did not provide any indication of dangerousness. Finally, during his stay in the Fort Polk Hospital and during the period immediately prior to his discharge, Carson's behavior had been acceptable. In short, General Haldane had ample basis to decide that a discharge of Carson pursuant to Chapter 10 was not inappropriate.

■ In any case, Chapter 10 merely establishes a procedure whereby individuals who have committed violations of the UCMJ and who are not likely to make good soldiers may be discharged, and the only purpose that may be inferred from the Chapter's language is the furtherance of the administrative convenience and efficiency of the Army. This being the case, even were it to be assumed that Carson's discharge violated the scope of Chapter 10, that violation would not establish negligence per se because Mr. Doyle was not a person intended to be protected by that provision.[6]

### ORDER

For the foregoing reasons, the action is dismissed and judgment will be entered accordingly.

---

**6.** Although not warranting extensive discussion, the court also finds that plaintiff's claims of negligence per se based upon AR 40–3, paras. 2–1, 6–3, 6–12(b), 7–1, and 7–5; AR 635–40, para. 3–5; AR 40–501, para. 3–2(b); and 10 U.S.C. § 1074(a) are likewise not meritorious. Briefly, these provisions pertain to such matters as the general duty of the Army to provide medical care to soldiers, the holding of psychiatric patients for evaluation, the proper use of Army medical boards, and the examination of soldiers to determine medical disability. In the court's view, these provisions were clearly not intended to protect the public and cannot form the basis of a claim here.