Jeffery L. **WILLIS** and Gregory C. **Willis**

v.

**UNITED STATES of America and Veterans Administration Medical Center.**

Glen M. **JEANSONNE**

v.

**UNITED STATES of America, State Farm Mutual Automobile Insurance Company and the Vacant or Unopened Succession of Granvil J. Gremillion.**

No. 85–2860.

United States District Court,
W.D. Louisiana,
Alexandria Division.

June 18, 1987.

Tucker L. Melancon, Marksville, La., Edward Larvadain, Alexandria, La., for plaintiffs.

Dewitt T. Methvin, Jr., Alexandria, La., John R. Halliburton and David Titman, Asst. U.S. Attys., Shreveport, La., for defendants.

## OPINION

LITTLE, District Judge.

These findings of fact and conclusions of law result from a nonjury trial held on 11 May 1987.

## FACTS

From 27 November to 4 December 1984 Granvil Gremillion was a patient at the Veterans Administration Hospital in Alexandria, Louisiana. At approximately 11:30 A.M., Mr. Gremillion was discharged from the hospital. On route to his home in Avoyelles Parish, Mr. Gremillion collided head-on with an automobile driven by Jeffery Willis. Both Jeffery Willis and his passengers, Gregory Willis and Glen Jeansonne, suffered severe injuries. Gremillion was readmitted to the VA Hospital on 4 December and died on 8 January 1985 from the injuries received in the collision.

Upon his admission to the VA Hospital on 27 November 1984, Gremillion was described as a grossly obese 60–year old white male. He was 5′9″ tall and weighed approximately 300 pounds. He complained of dyspnea or troubled breathing, and was diagnosed as having congestive heart failure, chronic obstructive pulmonary disease and marked obesity. During his stay in the VA Hospital he lost 26 pounds, attributed mostly to water weight. At discharge he was ambulating well without shortness of breath or the necessity for oxygen.[1]

On the morning of Mr. Gremillion's discharge, he was seen by treating physician S. R. Admal at approximately 11:00. On the same morning, Gremillion was given two medications, Digoxin, which aids in the heart efficiency, and Lasix, a diuretic. Admal warned Gremillion not to drive, due to the general condition of his health and his need for rest. Gremillion, according to Admal, stated that his family would come to the hospital and transport him to Avoyelles Parish. Nothing further was offered by Admal who believed that Gremillion was not going to drive home. Evidence from Mr. Gremillion's son, Jamie, who visited the deceased prior to his discharge from the VA reported that his father was alert. Moreover, the son evidenced no fear of driving with his father had that necessity occurred. To the same effect, Mrs. Gremillion communicated with her husband by phone on discharge day and she reported nothing unusual in his demeanor to indicate that he would have trouble driving. She

---

1. This was not Mr. Gremillion's first visit to the VA. Over 3 years he had been admitted 4 times, all for treatment of the same complaint, shortness of breath. The hospital records reflect a general increase in Gremillion's weight since he retired from an active job as a jailer at Angola, Louisiana. He was no stranger to the VA nor to the rather standardized treatment which he received on each visit.

did report that Mr. Gremillion was eager to get home. The evidence weighs in favor of Mr. Gremillion being an aware, gregarious, caring individual. The Court believes that Dr. Admal advised Mr. Gremillion not to drive and that Mr. Gremillion advised the doctor that the Gremillion family was tending to the transportation. There is no reason, under the circumstances, for Dr. Admal to doubt Mr. Gremillion nor should Admal have done more to get his message across.

Head Nurse Martha Branton testified about the VA's discharge procedures. Mrs. Branton advised Gremillion of his follow-up doctor appointments, went over his prescriptions, and advised him to see the dietician for a specialized food plan. Gremillion declined the dietary plan visit, stating that he was in a hurry to get home and that the recommended diet should be sent to him at his residence. A young man was with Gremillion during these instructions and that man, according to Branton, was Gremillion's son. Branton left the room at approximately 11:35.

Considering Gremillion's eagerness to check out of the hospital, it is reasonable to assume he left directly following his meeting with Nurse Branton. State Trooper Charles Rawson estimated that the drive from the hospital to the accident site would take no more than 20 to 30 minutes. Rawson reported that the time of the accident was, however, 2:22 P.M. and no hypothesis has been advanced to account for Gremillion's whereabouts during the lost 2 hours.

Jeffery and Gregory Willis testified as to the circumstances of the accident. Heading north on Highway 1, a two-lane highway, Jeff Willis noted a truck swerving into his lane. Hoping to avoid a collision, Jeff in turn moved into the other lane. The truck then swerved back into its own lane and Jeff did the same. Once more, however, the truck veered into the oncoming lane and although Jeff tried to avoid it, the collision was inevitable. The vehicles hit head-on near the center line. No evidence was presented as to Gremillion's version of the accident although he lived for a month after the incident.

Jeffery Willis and Gregory Willis, who are brothers, and their passenger, Glen Jeansonne, have asserted claims against the United States in this consolidated case for the negligence of the VA Hospital under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* Jurisdiction is proper by virtue of 28 U.S.C. § 2674 and 28 U.S.C. § 1346(b). State Farm, as the liability insurer of both the Gremillion and Willis vehicles, has intervened in order to assert its subrogation claim for monies already paid to the plaintiffs under the insurance policies.

The plaintiffs pursued several theories in their quest to prove that the VA Hospital was responsible for the damages caused by Mr. Gremillion. They first argued that the combination of drugs given to Gremillion, namely Digoxin and Lasix, would compound in such a way to cause sleepiness or drowsiness. The plaintiffs' case on this point remains unproven. The plaintiffs' own expert witness in pharmacology, Lee Roy Morgan, M.D., testified on cross-examination that he believed the medication prescribed by the VA was appropriate. The medicine, in Morgan's opinion, may exacerbate a patient's propensity to doze off but Morgan did not conclude that the decedent had such a propensity.

The plaintiffs then sought to show that a blood test of a Gremillion specimen taken the morning of his departure and analyzed after he had departed revealed a blood sugar level so high that it could have caused him to fall asleep or black out. Dr. Admal testified that although the blood sugar level was somewhat high it was not at a danger level and that the notation on the lab slip indicating that the patient should be asked to return to the hospital for a repeat test was merely precautionary and did not indicate a dangerous condition. This was confirmed by the Government's expert, Dr. Stephen Kilpatrick (Government exhibit 6). See also the deposition of Dr. John Wilson (Government exhibit 4). But even so, the test result was not known until after Mr. Gremillion absented himself from the VA. There is no evidence indicating that the testing was not diligently per-

formed or that the test result should have been received prior to discharge.

Finally, there was an argument that Gremillion had Pickwickian Syndrome, a sleep disorder which occurs in obese individuals who have a history of cardiopulmonary problems. Simply put, the patient's deep nocturnal sleep is interrupted by brief breathing stoppages, which cause the patient to awaken frequently. The lack of sustained deep sleep results in drowsiness and a tendency to doze or nod off during the day. However, plaintiffs brought forward no positive proof that Mr. Gremillion had Pickwickian Syndrome or, if he had it, that it was negligent not to diagnose or recognize that condition. Dr. Andrew Chesson, in his deposition testimony, felt that there was insufficient data available during Gremillion's first hospitalization to alert a physician to a possible diagnosis of Pickwickian Syndrome (Government exhibit 5).

## LAW

In suits brought under the Federal Tort Claims Act, substantive legal determinations are governed by the state law of the situs of the accident, which is Louisiana in this case. 28 U.S.C. § 1346(b); *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Before considering the law of Louisiana, this Court would be remiss if it did not mention a California case frequently cited concerning an alleged negligent release of a dangerous patient. In *Tarasoff v. Regents of the University of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976), a young man told a university psychologist that he planned to kill Tatiana Tarasoff. The psychologist reported this threat to the campus police, who briefly detained the man but released him because he seemed rational and promised to stay away from Tatiana. Neither Tatiana nor her family were warned of the threats. Two months later the young man murdered Tatiana.

To support a finding of liability on the part of the psychologist, the court relied upon the standard enunciated in section 315 of the Restatement, Second, of Torts:

> There is no duty to control the conduct of a third person as to prevent him for causing physical harm to another unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection.

In *Tarasoff*, the court requested that the psychologist's relationship with his patient supported an affirmative duty vis a vis third parties and the psychologist was held liable for failing to warn Tatiana or her parents of her peril. Recognizing, however, the potential Pandora's box it had created, the California Supreme Court limited *Tarasoff*'s scope and required the potential victim to be known and identifiable before liability could be imposed. *Thompson v. County of Alameda*, 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728 (1980); *see also Jablonski v. United States*, 712 F.2d 391 (9th Cir.1983).[2]

The reasoning behind this limitation was explained in *Anthony v. United States*, 616 F.Supp. 156 (D.Iowa 1985).

> The majority of courts that have addressed the issue at bar have determined that *Tarasoff*-type liability should not extend to create a duty to protect unspecified, unidentified persons. The "threats to specific victims" rule is based on a duty to warn and limits what would otherwise be unlimited and strict liability for health care providers who care for and counsel known dangerous persons.

*Tarasoff* and its progeny were applied to a factual situation similar to the one *sub judice* in *Harland v. State of California*, 75 Cal.App.3d 475, 142 Cal.Rptr. 201 (1977), wherein a resident of the California Veteran's Home collided with the plaintiff's vehicle. The appellate court reversed a judg-

---

**2.** The view espoused in Tarasoff and Thompson has been widely adopted. Prosser & Keeton on

Torts, § 56, p. 384 (5th ed. 1984).

ment for the plaintiffs which held the state liable on the theory that the state should have prevented the veteran from driving.

The veteran kept an automobile at the state administered home. He was regularly allowed a pass to visit his wife on weekends. While returning from such a trip, the accident occurred. The court found it unnecessary to establish the existence of a special relationship to overturn the trial court's ruling in defendant's favor. The state's liability was precluded under *Tarasoff, supra,* since "the risk was not one that could be guarded against by warning potential victims." *See also Jablonski v. United States, supra; Currie v. United States,* 644 F.Supp. 1074 (M.D.N.C.1986); *Hansenei v. United States,* 541 F.Supp. 999 (D.Md.1982); 42 A.L.R. 4th 153.

Louisiana negligence actions are governed by La.Civ.C. arts. 2315 and 2316.[3] Before legal responsibility will lie in tort, the duty-risk analysis announced in *Dixie Drive-It Yourself, Inc. v. American Beverage Co.,* 137 So.2d 298 (La.1962) requires the resolution of four inquiries:

(1) whether defendant's conduct was a cause in fact of the accident;

(2) whether defendant owed a legal duty encompassing the particular risk of harm to which the plaintiff was exposed;

(3) whether the defendant breached that duty; and

(4) what damages the plaintiff sustained.

*Jones v. Gillen,* 504 So.2d 575, 580 (La. App. 5th Cir.1987); *Hill v. Lundin & Associates,* 256 So.2d 620 (La.1972); *Ross v. Central Louisiana State Hospital,* 392 So.2d 698 (La.App. 3d Cir.1980).

Was the VA's release of Gremillion the cause in fact of the accident? A preponderance of the testimony does not provide an affirmative answer. There is evidence to suggest that Gremillion may have caused the accident but there is no credible evidence that patient Gremillion if released might have fallen asleep and injured anoth-

er motorist or pedestrian. The guidance of the Louisiana Supreme Court in *Frank v. Pitre,* 353 So.2d 1293 (La.1977) is apropos. There, the Supreme Court reversed the lower court's imposition of liability on the warden of the Evangeline Parish jail for a shooting committed by a negligently released prisoner. The prisoner, who was in custody on burglary and parole violation charges, was given a weekend pass and during that period of freedom was involved in a barroom brawl during which a policeman was shot.

The basis upon which the verdict was overturned was a lack of proximate cause.

> It is not enough to say that if [the prisoner] had not been released under the sheriff's policy of weekend passes, the tragedy would not have occurred.... There must be something more; there must be a closer connection between the act of the defendant and the injury of the plaintiff ... even though a reasonable man might have concluded, if he had thought about it, that a prisoner allowed to go home on Saturday might have gotten into a brawl in a saloon and shot a policeman.

*Id.* at 1296. Justice Tate, soon to be Fifth Circuit Court Judge Tate, noted that the same conclusion would result under the *Dixie Drive-It Yourself* duty-risk analysis. The "violation must not only be a cause in fact of ... the injury, but the duty violated must also have included within its purpose the prevention of the risk encountered by the plaintiff to his injury." *Frank,* 353 So.2d 1293, 1296 (Tate, J., concurring). Therefore, the mere fact of a release, without more, will not support liability. *Green v. State of Louisiana,* 91 So.2d 153 (La. App. 1st Cir.1956).

Reasoning similar to that in *Frank, supra,* was employed in a federal case applying Louisiana law. *Doyle v. United States,* 530 F.Supp. 1278 (C.D.Cal.1982). In *Doyle,* Carl Russell Carson was discharged from the Army and two days later

---

**3.** Article 2315 states, in pertinent part: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." Article 2316 provides: "Every person is responsible for the damage he occasions, not merely by his act, but by his negligence, his imprudence or his want of skill."

he killed Doyle, a security guard at Ventura College in Ventura, California.

Shortly after his arrival at the Army's Fort Polk, Louisiana facility, Carson began deliberately disobeying orders in the hope of securing a discharge. When questioned by the company commander about his behavior, Carson stated that he had joined the Army only to learn to kill people, but he wasn't being taught quickly enough. Subsequently, he was seen by the unit chaplain and three counselors. The consensus was that although Carson was preoccupied with the idea of killing, he appeared to present no immediate danger to himself or others. Finally, Carson was seen by an Army psychiatrist, Dr. Johansen. After speaking with him, Dr. Johansen determined that Carson's statements about killing were made in a deliberate attempt to obtain a discharge. Carson was, however, admitted to the Fort Polk Hospital for observation. There he was prescribed Thorazine, an antipsychotic and tranquilizer. Carson appeared to be calm and cooperative, although he often repeated his statement about wanting to learn to kill people. Dr. Johansen decided the killing statement was made for shock value and to overcome Carson's inadequate personality he released Carson. Instead of facing a court martial for his earlier insubordination, Carson was discharged from the Army. Upon his return to his home in Ventura, California, Carson murdered Doyle.

The court declined to hold the Army liable under the Federal Tort Claims Act, noting that "Louisiana courts have shown great reluctance to impose liability because of a failure to protect the public from a dangerous individual." *Doyle,* 530 F.Supp. at 1285. See *Frank v. Pitre, supra; Reid v. State,* 376 So.2d 977 (La.App. 1st Cir. 1979); *Graham v. State through Health & Social & Rehabilitation Services, supra; Cappel v. Pierson, supra.* "The Louisiana courts place great emphasis upon the physical and temporal proximity of the relevant events. Apparently in the absence of harm flowing directly and immediately from the event, the Louisiana courts do not view the release or escape of a patient or prisoner as

the proximate cause of injuries committed by that person." *Id.* at 1287.

If we assume that the VA's release of Gremillion was the cause in fact of the accident and if we assume plaintiffs were damaged as a result of the accident, did the VA breach a duty owed to the plaintiffs? Here again, the preponderance of the testimony does not produce an affirmative answer. Plaintiffs must prove by a preponderance of the evidence that there was a duty owed them by the VA when it released Gremillion. Certainly the VA must exercise reasonable care when discharging a patient with an immediate potential for causing harm to fellow travelers by operating a homeward bound vehicle. That is the implicit lesson of *Phillips v. Roy,* 494 So.2d 1342 (La.App. 2d Cir.1986). Roy had been hospitalized at Central Louisiana State Hospital a total of five times within a ten-year period for a condition diagnosed as schizophrenic paranoia accompanied by aggressive behavior. Throughout his final stay in the facility, he exhibited no violent behavior and was peaceful on two weekend visits to his home. The defendant's physician found the defendant to be in remission. Roy was released with instructions to continue taking antipsychotic medicine and to pursue follow-up appointments at a local mental health clinic. More than nineteen months after Roy's release and four months after ceasing to take his medication and cancelling his appointments at the mental health clinic, Roy purchased a .357 magnum pistol. He then proceeded to the Town of Winnfield whereupon he began randomly shooting at blacks, killing the plaintiff's husband.

In deciding whether the hospital was liable for the decedent's death, the court did not find it necessary to define the duty a state hospital owes to the public. Instead, the hospital was held not liable on the ground of a lack of legal cause or scope of a duty.

Assuming that the state hospital owed a general duty to the public to exercise reasonable care in the discharge of potentially dangerous patients, that duty did not extend to this particular victim or ... did not include within its scope the

**898**

protection of this victim from the particular risk he encountered. The connection between the conduct complained of and the harm suffered is too attenuated to impose liability on the state, whether it be explained as a lack of proximate or legal cause, lack of duty owed to this victim, or lack of inclusion of this risk within the scope of the duty.

*Id.* at 1346–1347. *Accord, Graham v. State through Health & Social & Rehabilitation Services,* 354 So.2d 602 (La.App. 1st Cir.1977); *Cappel v. Pierson,* 132 So. 391 (La.App.2d Cir.1931).

In this case, there is no medical evidence to indicate that Gremillion was a potentially dangerous patient at the time he was released. Even if potentially dangerous, the care exercised by the VA was reasonable. No duty was breached. As we previously stated, the Court believes Dr. Admal who testified that he cautioned Gremillion not to drive home. Gremillion was a lucid, ambulatory and seemingly reasonable individual. When confronted with the warning, Gremillion advised that his family would carry him back home. In this Court's opinion, the VA's action is reasonable in light of the condition of Gremillion.

Following the guidance of Louisiana law, this Court is unable to find that the risk encountered by the plaintiffs was one which the VA should have anticipated when it released Mr. Gremillion. The evidence does not preponderate to prove that Gremillion's medication, blood sugar or possible Pickwickian Syndrome should have prevented his release from the VA Hospital. Nor does it prove that he was unable to drive. Furthermore, Dr. Admal's admonition to Gremillion was understood and accepted. Accordingly, plaintiffs' claims are DISMISSED with prejudice.